# UNITED STATES *v.* LANE ET AL.

No. 84–744.   Argued October 9, 1985—Decided January 27, 1986*

---

*Together with No. 84–963, *Lane et al.* v. *United States*, also on certiorari to the same court.

BURGER, C. J., delivered the opinion of the Court, in which WHITE, POWELL, REHNQUIST, and O'CONNOR, JJ., joined, and in Part III of which BRENNAN, MARSHALL, BLACKMUN, and STEVENS, JJ., joined. BRENNAN, J., filed an opinion concurring in part and dissenting in part, in which BLACKMUN, J., joined, *post*, p. 453. STEVENS, J., filed an opinion concurring in part and dissenting in part, in which MARSHALL, J., joined, *post*, p. 465.

*Bruce N. Kuhlik* argued the cause for the United States. With him on the briefs were former *Solicitor General Lee, Acting Solicitor General Fried, Assistant Attorney General Trott, Deputy Solicitor General Frey,* and *Joel M. Gershowitz.*

*Clifford W. Brown* argued the cause for respondents in No. 84–744 and petitioners in No. 84–963. With him on the brief was *Robert Michael Brown.*

CHIEF JUSTICE BURGER delivered the opinion of the Court.

We granted certiorari to resolve a conflict among the Circuits as to whether a misjoinder under Rule 8 of the Federal

Rules of Criminal Procedure is subject to the harmless-error rule,[1] and to determine whether there is sufficient evidence in this case to support convictions for mail fraud under 18 U. S. C. § 1341.

## I

## A

James Lane and three partners opened the El Toro Restaurant in Amarillo, Texas, in the summer of 1978. The business never operated at a profit, however, and sales began to decline that fall. In November, Lane purchased fire insurance covering the building's contents and improvements and any related business losses. Simultaneously, he hired Sidney Heard, a professional arsonist, to burn the building in order to escape the lease and partnership. On February 27, 1979, Heard set a fire that caused smoke damage to the building's contents. Lane first settled with the insurer on the contents and improvements. He then submitted an income statement that falsely indicated the restaurant had operated at a profit. After the insurance adjuster mailed the statement to the insurer's headquarters, Lane settled his business interruption claim.

---

[1] Six Circuits have adopted a *per se* approach holding that misjoinder is always reversible error. See *United States* v. *Turkette*, 632 F. 2d 896, 906, and n. 35 (CA1 1980), rev'd on other grounds, 452 U. S. 576 (1981); *United States* v. *Graci*, 504 F. 2d 411, 414 (CA3 1974); *United States* v. *Bova*, 493 F. 2d 33 (CA5 1974); *United States* v. *Bledsoe*, 674 F. 2d 647, 654, 657–658 (CA8), cert. denied *sub nom. Phillips* v. *United States*, 459 U. S. 1040 (1982); *United States* v. *Eagleston*, 417 F. 2d 11, 14 (CA10 1969); *United States* v. *Ellis*, 709 F. 2d 688, 690 (CA11 1983).

Six have subjected misjoinder claims to harmless-error analysis. See *United States* v. *Ajlouny*, 629 F. 2d 830, 843 (CA2 1980), cert. denied, 449 U. S. 1111 (1981); *United States* v. *Seidel*, 620 F. 2d 1006 (CA4 1980); *United States* v. *Hatcher*, 680 F. 2d 438, 442 (CA6 1982); *United States* v. *Varelli*, 407 F. 2d 735, 747–748 (CA7 1969); *United States* v. *Martin*, 567 F. 2d 849, 854 (CA9 1977); *Baker* v. *United States*, 131 U. S. App. D. C. 7, 21–23, 401 F. 2d 958, 972–974 (1968). Most of these courts had previously taken the view that misjoinder is prejudicial *per se*.

In early 1980, Lane again hired Heard to set fire to a duplex that Lane was moving to a vacant lot in Amarillo. Lane obtained a fire insurance policy on the building, listing the owner as L & L Properties, a partnership between his son Dennis Lane and Andrew Lawson. An accomplice of Heard's burned the duplex on May 1, 1980.

Thereafter, on three occasions Dennis Lane signed proof-of-loss claims for repairs and submitted them to an insurance adjuster, who issued drafts in return totaling $12,000.[2] Each time, the adjuster later mailed the proof-of-loss to the insurer's headquarters. The adjuster issued a final settlement draft for $12,250 on September 16, 1980. Two days later, he mailed a memorandum to headquarters explaining why repairs had exceeded previous estimates by some $10,000. He enclosed invoices supplied by Dennis Lane listing various materials and furniture purportedly purchased to repair and refurbish the duplex. In fact, these invoices had been fabricated by James Lane, Heard, and Heard's secretary.

The Lanes and Lawson met with Heard several weeks after the duplex fire to discuss a proposal to establish and burn a flower shop in Lubbock, Texas. Heard and Dennis Lane picked out a suitable building in July 1980, and an accomplice of Heard's, William Lankford, prepared ficticious invoices for merchandise and delivered some artificial flowers to the building later in August. In November, James Lane insured the contents for $50,000. Heard, however, was later arrested for an unrelated crime, and the planned arson never took place.

In March 1981, an Amarillo newspaper article connected Dennis Lane with a scheme to burn the flower shop with Heard; that same day, James Lane canceled the insurance policy. On May 12, 1981, Dennis Lane appeared before a

---

[2] Each proof-of-loss form stated that the "loss did not originate by any act, design or procurement on the part of your insured or this affiant" and that "no attempt to deceive [the] company as to the extent of the loss has been made."

federal grand jury investigating Heard. He testified that Heard had nothing to do with the flower shop or with his own dealings with Lankford.

## B

James Lane and Dennis Lane were indicted in multiple counts for mail fraud in violation of 18 U. S. C. § 1341, conspiracy in violation of 18 U. S. C. § 371, and perjury in violation of 18 U. S. C. § 1623. Count 1 charged James Lane with mail fraud with regard to the El Toro Restaurant fire. Counts 2 through 4 charged both Lanes with mail fraud related to the duplex fire, and Count 5 charged them with conspiracy to commit mail fraud in connection with the flower shop arson plan. In Count 6, Dennis Lane was charged with perjury before the grand jury.

Prior to trial in the District Court for the Northern District of Texas, the Lanes filed motions for severance contending that the charged offenses were misjoined in violation of Federal Rule of Criminal Procedure 8(b), but the motions were denied and the trial proceeded jointly before a jury. When evidence relating to the El Toro Restaurant fire was admitted, the trial court instructed the jury not to consider that evidence against Dennis Lane. App. 21. The trial judge repeated this instruction in the final charge, together with an instruction regarding the separate consideration to be given each defendant and each count. *Ibid.* The Lanes renewed their severance motions at the end of the Government's evidence and at the close of all evidence, but the motions were again denied. The jury returned convictions on all counts.

On appeal, the Lanes argued that misjoinder under Rule 8(b) had occurred.[3] The Court of Appeals for the Fifth Cir-

---

[3] Rule 8(b) provides:

"(b) Joinder of Defendants. Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in

cuit concluded that Counts 2 through 6 were properly joined, but agreed "that Count 1 should not have been joined with the others because it was not part of the same series of acts or transactions as Counts 2 through 6." 735 F. 2d 799, 803–804 (1984). The court refused to consider the Government's argument that the error, if any, was harmless, stating only that "Rule 8(b) misjoinder is prejudicial *per se* in this circuit." *Id.*, at 806 (citing *United States* v. *Levine*, 546 F. 2d 658 (CA5 1977)). The court reversed the Lanes' convictions and remanded for new trials.

At the same time, the Court of Appeals rejected the Lanes' contention that there was insufficient evidence to support convictions for mail fraud under Counts 2 through 4 because each charged mailing occurred *after* each related payment had been received, and thus after each scheme had reached fruition.[4] The Court of Appeals distinguished our holding in *United States* v. *Maze*, 414 U. S. 395 (1974), and instead relied on *United States* v. *Sampson*, 371 U. S. 75 (1962), to hold that mailings occurring after receipt of an insurance payment may nevertheless be "in execution of fraud" as required by 18 U. S. C. § 1341 where they are "designed to lull the victims into a false sense of security and postpone investigation." 735 F. 2d, at 807–808.

The court found sufficient evidence for the properly instructed jury to "infer that the mailings were intended to and did have a lulling effect" because they helped persuade the insurer that "the claims were legitimate." *Id.*, at 808. It emphasized that had the proof-of-loss forms not been mailed shortly after issuance of the insurance drafts, the insurer might have been alerted to the possibility of a fraud. *Ibid.*

---

one or more counts together or separately and all of the defendants need not be charged in each count."

[4] The Court of Appeals also rejected James Lane's challenge to the sufficiency of the evidence with regard to Count 1. That holding was not challenged in the Lanes' cross-petition.

Similarly, the false invoices submitted by Dennis Lane "gave the impression of a perfectly innocent claim." *Ibid.*

The Government's petition for rehearing was denied. 741 F. 2d 1381 (1984). We granted certiorari, 469 U. S. 1206 (1985). We reverse in part and affirm in part.

## II

The Court of Appeals held that misjoinder "is inherently prejudicial."[5] 735 F. 2d, at 804. The Circuits are divided on the question whether misjoinder requires automatic reversal, or whether the harmless-error rule governs.[6] Most Circuits that have adopted the *per se* approach have relied on *McElroy* v. *United States*, 164 U. S. 76 (1896), where this Court applied the joinder statute then in force and reversed convictions of jointly tried defendants after rejecting the Government's argument that there was no showing of prejudice. *Id.*, at 81.

*McElroy*, however, was decided long before the adoption of Federal Rules of Criminal Procedure 8 and 52, and prior to the enactment of the harmless-error statute, 28 U. S. C. § 2111, which provides that on appeal we are to ignore "errors or defects which do not affect the substantial rights of the parties." Under Rule 52(a), we are similarly instructed that any error "which does not affect substantial rights shall be disregarded."[7]

---

[5] Although the Government continues to believe that Count 1 was properly joined with Counts 2 through 6, it does not challenge that holding here.

[6] See n. 1, *supra.*

[7] JUSTICE STEVENS' partial dissent argues that *McElroy* conclusively determined misjoinder is prejudicial *per se*, and that Rule 8 was intended to represent a restatement of existing law, including the "rule of the *McElroy* case." *Post*, at 467. Rule 8, however, is simply a procedural rule with certain technical requirements, and JUSTICE STEVENS' opinion refers to the Advisory Committee on Rules' citation of *McElroy*, see *post*, at 468, n. 3, making clear they were referring only to those *technical* requirements of prior law. Nowhere is there any indication Rule 8 was in-

The Court's holding in *Chapman* v. *California*, 386 U. S. 18 (1967), made a significant change in the law of harmless error. There, Justice Black, speaking for the Court, emphasized that even "some constitutional errors [may] be deemed harmless, not requiring the automatic reversal of the conviction." *Id.*, at 22. In rejecting the automatic reversal rule, the Court stated:

> "We are urged by petitioners to hold that all federal constitutional errors, regardless of the facts and circumstances, must always be deemed harmful. . . . *We decline to adopt any such rule.*" *Id.*, at 21–22 (emphasis added).

Justice Black went on to note that all 50 States follow the harmless-error approach, and

> "the United States long ago through its Congress established . . . the rule that judgments shall not be reversed for 'errors or defects which do not affect the substantial rights of the parties.' 28 U. S. C. § 2111. None of these rules on its face distinguishes between federal constitutional errors and errors of state law or federal statutes and rules." *Id.*, at 22 (footnote omitted).

Since *Chapman*, we have "consistently made clear that it is the duty of a reviewing court to consider the trial record as a whole and to ignore errors that are harmless, including most constitutional violations." *United States* v. *Hasting*, 461 U. S. 499, 509 (1983). In *Hasting*, we again emphasized that

> "given the myriad safeguards provided to assure a fair trial, and taking into account the reality of the human fallibility of the participants, there can be no such thing as an error-free, perfect trial, and . . . the Constitution does not guarantee such a trial." *Id.*, at 508–509.

tended to enshrine any substantive "principle" of *McElroy* that misjoinder requires reversal, nor is there any citation of *McElroy*'s specific holding.

In this case, the argument for applying harmless-error analysis is even stronger because the specific joinder standards of Rule 8 are not themselves of constitutional magnitude.[8] Clearly, *Chapman* and *Hasting* dictate that the harmless-error rule governs here.[9]

The applicability of harmless error to misjoinder also follows from *Kotteakos* v. *United States*, 328 U. S. 750 (1946), a case similar to the one at hand. There, some 32 defendants were charged with one conspiracy, when in fact there had been at least eight separate conspiracies. Nineteen defendants were jointly tried, and seven were convicted. The Court applied the harmless-error statute to an error resulting from a variance from the indictment, and held the error was not harmless in that case. Emphasizing the numerous conspiracies involving unrelated defendants, as well as seriously flawed jury instructions, the *Kotteakos* Court reversed the convictions in light of each of the 32 defendants' "right not to be tried *en masse* for the conglomeration of distinct and separate offenses" involved. *Id.*, at 775.

---

[8] Improper joinder does not, in itself, violate the Constitution. Rather, misjoinder would rise to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial.

[9] JUSTICE STEVENS' partial dissent suggests *Chapman* is irrelevant to our analysis because that case involved a *constitutional* violation, whereas the error here is of a nonconstitutional nature. *Post*, at 472. It is difficult to see any logic in the argument that although the harmless-error rule may be applicable to *constitutional* violations, it should not be applied to violations of mere procedural rules. JUSTICE STEVENS recognizes that the standard for harmless-error analysis adopted in *Chapman* concerning constitutional errors is considerably more onerous than the standard for nonconstitutional errors adopted in *Kotteakos* v. *United States*, 328 U. S. 750 (1946). See *post*, at 472–473, n. 11. The heightened regard we have for constitutional protections surely warrants a conclusion that nonconstitutional provisions must be treated at least comparably, and in *Hasting* we emphasized even "most constitutional violations" must be ignored if they are harmless. 461 U. S., at 509.

Although the Court's review in that case was from the perspective of a variance from the indictment, rather than misjoinder, the Court recognized that misjoinder was implicated, and suggested that the harmless-error rule could similarly apply in that context.[10]   *Id.*, at 774–775.

A holding directly involving misjoinder again indicated the harmless-error rule should apply.   In *Schaffer* v. *United States*, 362 U. S. 511 (1960), three different groups of defendants were charged with participating in separate criminal acts with one other group of three defendants.   The indictment also charged all the defendants with one overall count of conspiracy, making joinder under Rule 8 proper.   At the close of the Government's case, however, the District Court concluded there was insufficient evidence of conspiracy and dismissed that count.   The court then denied a motion for severance after concluding that defendants failed to show prejudice from the joint trial; the Court of Appeals affirmed. This Court recognized that "the charge which originally justified joinder turn[ed] out to lack the support of sufficient evidence."   *Id.*, at 516.   Essentially, at that point in the trial, there was a clear error of misjoinder under Rule 8 standards. Nevertheless, the *Schaffer* Court held that once the Rule 8 requirements were met by the allegations in the indictment, severance thereafter is controlled entirely by Federal Rule of Criminal Procedure 14, which requires a showing of prejudice.   *Id.*, at 515–516.   The Court then affirmed the finding of no prejudice.   Although the Court did not reach the harmless-error rule because Rule 8(b) had initially been satisfied, the Court's language surely assumed the rule was applicable.

A plain reading of these cases shows they dictate our holding.   Applying the 1919 statute treated in *Kotteakos*, which

---

[10] The Court pointed out that "the problem is not merely one of variance . . . but is also essentially one of proper joinder."   328 U. S., at 774. Even so, the Court indicated the harmless-error rule must apply, although perhaps with "restraint."   *Id.*, at 775.

governed only "technical errors," 28 U. S. C. § 391 (1946 ed.), the Court emphasized the clear intent of Congress "was simple: To substitute judgment for automatic application of rules." 328 U. S., at 759–760. "In the final analysis judgment in each case must be influenced by conviction resulting from examination of the proceedings in their entirety, tempered but not governed in any rigid sense of *stare decisis* by what has been done in similar situations." *Id.*, at 762. The Court flatly rejected *per se* rules regarding particular errors because "any attempt to create a generalized presumption to apply in all cases would be contrary not only to the spirit of [the statute] but also to the expressed intent of its legislative sponsors." *Id.*, at 765.

*Schaffer* discussed the current harmless-error statute, which was enacted in 1949 after *Kotteakos* and deleted the qualifying word "technical" regarding errors governed by the rule. See 28 U. S. C. § 2111. The Court again rejected any *per se* rule for joinder errors requiring reversal, refusing to "fashion a hard-and-fast formula that . . . [the] joinder [wa]s error as a matter of law." 362 U. S., at 516. Citing *Kotteakos*, the Court pointed out that there "[t]he dissent agreed that the test of injury resulting from joinder 'depends on the special circumstances of each case.'" 362 U. S., at 517 (quoting 328 U. S., at 777 (Douglas, J., dissenting)).[11]

---

[11] Contrary to these clear holdings, JUSTICE STEVENS' partial dissent advocates a rule-by-rule review establishing bright-line *per se* rules whether to conduct harmless-error analysis. *Post*, at 472–474. But on its face, Rule 52(a) admits of no broad exceptions to its applicability. Any assumption that once a "substantial right" is implicated it is inherently "affected" by any error begs the question raised by Rule 52(a). Assuming there is a "substantial right," the inquiry remains whether the error "affects substantial rights" requiring reversal of a conviction. That kind of inquiry requires a review of the entire record. See *United States* v. *Hasting*, 461 U. S., at 509. It is simply too late in the day to argue that Congress intended to incorporate any *per se* rule of *McElroy* for misjoinder following *Kotteakos*, the subsequent enactment of an arguably broader statute, and this Court's prejudice inquiry in *Schaffer*.

In common with other courts, the Court has long recognized that joint trials "conserve state funds, diminish inconvenience to witnesses and public authorities, and avoid delays in bringing those accused of crime to trial." *Bruton* v. *United States*, 391 U. S. 123, 134 (1968). Rule 8 accommodates these interests while protecting against prejudicial joinder. But we do not read Rule 8 to mean that prejudice results *whenever* its requirements have not been satisfied.

Under Rule 52(a), the harmless-error rule focuses on whether the error "affect[ed] substantial rights." In *Kotteakos* the Court construed a harmless-error statute with similar language, and observed:

> "The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand." 328 U. S., at 765.

Invoking the *Kotteakos* test, we hold that an error involving misjoinder "affects substantial rights" and requires reversal only if the misjoinder results in actual prejudice because it "had substantial and injurious effect or influence in determining the jury's verdict." *Id.*, at 776. Only by so holding can we bring Rules 8 and 52(a) "into substantial harmony, not into square conflict." [12] *Id.*, at 775.

---

[12] Respondents argue that application of the harmless-error rule to Rule 8(b) misjoinder will eviscerate Rule 14, which provides the trial court with discretion to grant a severance even if the joinder is proper under Rule 8 when it believes the defendants or the Government may be prejudiced by a joinder. We see no conflict with our holding and the applicability of Rule 14. Rule 14's concern is to provide the trial court with some flexibility when a joint trial may appear to risk prejudice to a party; review of that decision is for an abuse of discretion. Rule 8(b), however, requires the granting of a motion for severance unless its standards are met, even in the absence of prejudice; review on appeal is for an error of law. Applying the harmless-error rule to Rule 8(b) misjoinder simply goes to the additional question whether the error requires setting aside the convictions. We

Of course, "we are not required to review records to evaluate a harmless-error claim, and do so sparingly, [but] we plainly have the authority to do so." *United States* v. *Hasting*, 461 U. S., at 510 (footnote omitted).

In the face of overwhelming evidence of guilt shown here, we are satisfied that the claimed error was harmless. When evidence on misjoined Count 1 was introduced, the District Court provided a proper limiting instruction, and in the final charge repeated that instruction and admonished the jury to consider each count and defendant separately. Moreover, the same evidence on Count 1 would likely have been admissible on joint retrial of Counts 2 through 6 to show James Lane's intent under Federal Rule of Evidence 404(b). Any error therefore failed to have any "substantial influence" on the verdict. *Kotteakos, supra,* at 765.[13]

---

need not decide whether the degree of prejudice necessary to support a Rule 14 motion for severance is identical to that necessary to require reversal for a Rule 8(b) error.

JUSTICE STEVENS' partial dissent fails to recognize that the Rule 14 prejudice component involves a different inquiry from the Rule 8 technical requirements. Indeed, the express language of Rule 14, as well as the Advisory Committee Note, shows that Congress tolerates some Rule 8 joinders even when there is prejudice. The first hurdle in obtaining a severance under Rule 14 is a showing of prejudice, and if shown, it remains in the district court's discretion whether to grant the motion.

[13] We can agree with JUSTICE STEVENS' partial dissent "that the harmless-error inquiry is entirely distinct from a sufficiency-of-the-evidence inquiry." *Post,* at 476; our reliance on the *Kotteakos* test makes that clear. See *supra,* at 449. But that does not in any sense mean that overwhelming evidence of guilt is irrelevant; the threshold of overwhelming evidence is far higher than mere sufficiency to uphold conviction.

Nor may proper limiting instructions or jury charges never be "an adequate response" to a prejudice inquiry. *Post,* at 477. Contrary to the suggestion of the dissent, *Blumenthal* v. *United States,* 332 U. S. 539 (1947), provides direct support for the Court's approach in this case. There the Court recognized that, *in the context of mass trials* (as in *Kotteakos*), limiting instructions on evidence admissible only as to one defendant might in some circumstances be inadequate to prevent prejudice. 332 U. S.,

## III

Respondents challenge the sufficiency of the evidence to sustain their convictions. To find a violation of the mail fraud statute, 18 U. S. C. § 1341,[14] the charged "mailings" must be "for the purpose of executing the scheme." *Kann* v. *United States*, 323 U. S. 88, 94 (1944). Mailings occurring after receipt of the goods obtained by fraud are within the statute if they "were designed to lull the victims into a false sense of security, postpone their ultimate complaint to the

at 559–560. But here, as in *Blumenthal*, we are not faced with any trial en masse of numerous defendants and unrelated crimes.

When there are few defendants and the trial court is aware of the potential for prejudice, "the risk of transference of guilt over the border of admissibility [may be] reduced to the minimum" by carefully crafted limiting instructions with a strict charge to consider the guilt or innocence of each defendant independently. *Id.*, at 560. We cannot necessarily "assume that the jury misunderstood or disobeyed" such instructions. *Id.*, at 553. Indeed, this Court's conclusion in *Schaffer* that defendants failed to show prejudice was based directly on the fact that "the judge was acutely aware of the possibility of prejudice and was strict in his charge—not only as to the testimony the jury was not to consider, but also as to that evidence which was available in the consideration of the guilt of each [defendant] separately under the respective substantive counts." 362 U. S., at 516.

The same caution was exercised by the trial judge here, and no different result should be required. The Government initially observes that because of the similarity of each arson scheme, "only the court of appeals' narrow reading of Rule 8" led to its finding of misjoinder. At trial, Heard and Lankford—two principal actors—testified against both Lanes, who relied essentially on denials or character defenses. Moreover, the evidence as to Count 1 was distinct and easily segregated from evidence relating to Counts 2 through 6. The misjoinder error, if any, in these circumstances was harmless.

[14] The statute provides in relevant part:

"Whoever, having devised or intending to devise any scheme or artifice to defraud, . . . for the purpose of executing such scheme or artifice . . . , places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, . . . or knowingly causes to be delivered by mail . . . any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both."

authorities, and therefore make the apprehension of the defendants less likely than if no mailings had taken place." *United States* v. *Maze*, 414 U. S., at 403. See *United States* v. *Sampson*, 371 U. S. 75 (1962).

Only Counts 2 through 4, involving the duplex fire, are at issue. The Lanes argue that each mailing occurred after irrevocable receipt of the related payment, and thus after each scheme to defraud came to fruition.[15] This argument misconstrues the nature of the indictment, which charged an overall scheme to defraud based on the events surrounding the duplex fire. Counts 2 through 4 merely relate to separate mailings concerning partial payments that were a part of the whole scheme. The jury could properly find the scheme, at the earliest, was not completed until receipt of the last payment on September 16, 1980, which finally settled their claim. Hence, the mailings charged in Counts 2 and 3 clearly took place while the scheme was still continuing.

Moreover, the jury could reasonably have found that the scheme was not completed until the final mailing on September 18, 1980, charged in Count 4, because that mailing was intended (as were the two earlier ones) to "lull" the insurer into a false sense of security.[16] The jury was properly in-

---

[15] The Government contends that undisputed testimony shows the insurance drafts issued to the Lanes, unlike normal business checks, were not payable on demand but only upon authorization from the insurer's home office when they arrived at the insurer's bank for collection. If the drafts deposited by the Lanes had been dishonored by the insurer's banks, the amounts would have been charged against their account. The Lanes, therefore, may not have irrevocably received the proceeds of the fraud prior to the final mailing. See Brief for United States 30–31. The Court of Appeals, however, did not rely on this argument, and we decline to resolve this factual issue here.

[16] Our conclusion that the delayed mailings at issue in this action were part of an ongoing scheme to defraud is in accord with our holding in *United States* v. *Sampson*, 371 U. S. 75 (1962). In that case, defendants purported to help businessmen obtain loans or sell their businesses in exchange for an "advance fee." *Id.*, at 77. Following the deposit of checks for these fees, the defendants' plan called for the mailing of a form letter assuring the victims of the fraud that they were receiving the services they

structed that each charged mailing must have been made both "for the purpose of executing the scheme to defraud," App. 22, and *prior* to the scheme's completion, *id.*, at 23, and further that mailings "which facilitate concealment of the scheme" are covered by the statute.[17]  *Id.*, at 24.

The judgment of the Court of Appeals, ordering a new trial based on misjoinder of Count 1 with Counts 2 through 6, is reversed in part and affirmed in part, and the action is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE BRENNAN, joined by JUSTICE BLACKMUN, concurring in part and dissenting in part.

I agree that the evidence was sufficient to sustain the mail fraud convictions and therefore join Part III of the Court's

---

paid for.  *Id.*, at 78.  The Court upheld defendants' convictions for mail fraud because of the "lulling effect" of the delayed mailings.

We see no conflict with our holding in *United States* v. *Maze*, 414 U. S. 395 (1974).  There, use of a stolen credit card led to the mailing of charge statements to a bank.  We held that the fraud was completed upon the defrauder's receipt of the goods, distinguishing *Sampson* because the mailing of the charge slips, rather than acting to "lull" the bank into acquiescence, instead "increased the probability that [the defrauder] would be detected and apprehended."  414 U. S., at 403.  Had the Lanes failed to submit timely proof-of-loss forms here, the insurer might very well have discovered the fraud.

The Lanes contend that the Fifth Circuit's decision in this action also conflicts with *United States* v. *Ledesma*, 632 F. 2d 670 (CA7), cert. denied, 449 U. S. 998 (1980), which reversed a conviction involving the mailing of a fraudulent proof-of-loss form after receipt of insurance proceeds.  In that case, however, the Seventh Circuit never discussed *Sampson* or the possibility that the delayed mailing had any "lulling" effect.

[17] The Lanes argue that the Government must show that the charged mailings were specifically intended to lull, rather than showing simply a general intention on their part to defraud, in order to come within *Sampson*'s holding.  We need not determine whether any such specific intent must be shown, as we agree with the Court of Appeals that there was sufficient evidence for the jury to infer specific intent to lull here under these instructions, which the Lanes did not challenge on appeal or in their cross-petition.

opinion. I also agree that the Court of Appeals erred in holding that misjoinder under Rule 8 of the Federal Rules of Criminal Procedure is prejudicial *per se.* I write separately, however, because my reasons for reaching this conclusion differ from the Court's, and because I agree with JUSTICE STEVENS that the harmless-error inquiry should be made in the first instance by the Court of Appeals.

## I

The Act of February 26, 1919 (1919 Act), 40 Stat. 1181, amended § 269 of the Judicial Code. It provided in part:

> "On the hearing of any appeal, certiorari, writ of error, or motion for a new trial, in any case, civil or criminal, the court shall give judgment after an examination of the entire record before the court, without regard to technical errors, defects, or exceptions which do not affect the substantial rights of the parties." 28 U. S. C. § 391 (1925–1926 ed.).

In 1949, this provision was reenacted in its current form as 28 U. S. C. § 2111, and now instructs appellate courts to "give judgment after an examination of the record without regard to errors or defects which do not affect the substantial rights of the parties." The 1919 Act was also incorporated in the Federal Rules of Criminal Procedure, and Rule 52(a) provides that "[a]ny error, defect, irregularity or variance which does not affect substantial rights shall be disregarded." See also, Fed. Rule Civ. Proc. 61 ("The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties"). Although § 2111 and Rule 52(a) refer to "errors or defects" without the qualifying word "technical," this change did not alter the substantive legal test. See H. R. Rep. No. 352, 81st Cong., 1st Sess., 18 (1949) (§ 2111 "[i]ncorporates" former harmless-error statute); Advisory Committee's

Notes on Fed. Rule Crim. Proc. 52(a), 18 U. S. C. App., p. 657 (Rule is a "restatement of existing law").

The 1919 Act, § 2111, and Rule 52(a) all provide that an error is to be disregarded unless it "affects the substantial rights of the parties." This litigation thus presents a straightforward question of statutory construction: what does the phrase "affects the substantial rights of the parties" mean? Respondents in No. 84–744 contend that the term "substantial rights" refers to a particular class of rights which are essential to a fair trial and argue that errors which "affect" these rights cannot be disregarded on appeal. According to respondents, the 1919 Act, as reenacted in § 2111 and Rule 52(a), incorporated our holding in *McElroy* v. *United States*, 164 U. S. 76 (1896), that joinder is one of these "substantial rights," so that misjoinder is *per se* reversible.

For the reasons which follow, I conclude that the question whether a particular error "affects the substantial rights of the parties" does not entail a process of classification, whereby some rights are deemed "substantial" and errors affecting these rights are automatically reversible. Rather, an error "affects substantial rights" only if it casts doubt on the outcome of the proceeding. In other words, subject to the exceptions discussed in Part II (most importantly the exception for constitutional errors), I read § 2111 and Rule 52(a) to require harmless-error inquiry for all procedural errors. As none of these exceptions is applicable to misjoinder in violation of Rule 8, I concur in the Court's result on this issue.

Reference to whether error "affected the substantial rights of the parties" was not invented by Congress in 1919. The phrase was commonly used by courts throughout the 19th century to express the conclusion that particular claims of error did or did not warrant reversal. However, as used by these courts, error which "affected the substantial rights of the parties" was generally understood to refer, not to errors respecting a particular class of rights, but rather to any error which affected the fairness of the trial as a whole by calling

into question the reliability of the result. See, *e. g., Connors* v. *United States,* 158 U. S. 408, 411, 414 (1895); *Maish* v. *Arizona,* 164 U. S. 599, 602 (1896); *Williams* v. *United States,* 168 U. S. 382, 390–398 (1897); *American Surety Co.* v. *Pauly,* 170 U. S. 133, 159 (1898); *McCabe & Steen Constr. Co.* v. *Wilson,* 209 U. S. 275, 279 (1908); *Holmgren* v. *United States,* 217 U. S. 509, 523–524 (1910). In other words, the statement that an error did not "affect the substantial rights of the parties" was a way of stating the conclusion that the error was not prejudicial.

A careful reading of *McElroy* demonstrates that it is consistent with this understanding of the phrase "affects the substantial rights of the parties." In *McElroy,* five defendants were charged in two indictments with separate assaults and in a third indictment with arson. Three of the defendants were also charged in yet a fourth indictment with another assault. After explaining these charges, the Court noted that "it is the settled rule . . . to confine the indictment to one distinct offence or restrict the evidence to one transaction" because "[i]n cases of felony, the multiplication of distinct charges has been considered so objectionable as tending to confound the accused in his defence, or to prejudice him as to his challenges . . . ." 164 U. S., at 80. The Court then stated: "Necessarily where the accused is deprived of a substantial right by the action of the trial court, such action, having been properly objected to, is revisable on error." *Ibid.* In context, this merely restates the common-law understanding that an error is reversible if it prejudices the defendant. The Court did not state that joinder is a "substantial right" and, for this reason, any error respecting joinder is reversible. Rather, the Court held that "[i]t cannot be said in [a case of improper joinder] that all the defendants may not have been embarrassed and prejudiced in their defence, or that the attention of the jury may not have been distracted to their injury in passing upon distinct and independent transactions." *Id.,* at 81. In other words, the

Court concluded that misjoinder is the kind of error which must be presumed to have prejudiced the accused and, for *that* reason, misjoinder affects his "substantial rights." As discussed in Part II, the irrebuttable presumption that misjoinder is prejudicial is inconsistent with the Court's subsequent harmless-error jurisprudence and can be overruled. For the moment, however, it is important only to note that nothing in *McElroy* suggests that the requirement that error have "affect[ed] the substantial rights of the parties" refers to anything other than that the error have been prejudicial.

Absent some contrary indication, then, it would seem logical to conclude that when Congress used the phrase "affect[s] the substantial rights of the parties" in the 1919 Act, Congress meant to require an inquiry into whether an error cast doubt on the verdict, not to create a class of rights as to which error was *per se* reversible. The legislative history of the 1919 Act confirms that this was in fact what Congress intended.

The primary impetus for the enactment of the 1919 Act was the practice in some jurisdictions of reversing convictions on appeal for any procedural error at trial, without regard to whether the error was prejudicial. See *Kotteakos* v. *United States*, 328 U. S. 750, 758–759 (1946). There was also concern over the inconsistent application of harmless-error analysis by other courts, this Court in particular. See H. R. Rep. No. 913, 65th Cong., 3d Sess., 2 (1919) (quoting H. R. Rep. No. 611, 62d Cong., 2d Sess., 2 (1912)). The large number of reversals which resulted from failure to scrutinize errors for their prejudicial effect was criticized by leaders of the legal profession, including Taft, Pound, Wigmore, and Hadley. See *Kotteakos, supra,* at 758–759. After prolonged consideration, Congress responded to this criticism by passing the 1919 Act. The House Report accompanying the Act explained:

> "'It is the purpose of the . . . bill to enact, in so far as the appellate courts are concerned, that in the consideration

in an appellate court of a writ of error or an appeal judgment shall be rendered upon the merits without permitting reversals for technical defects in the procedure below and *without presuming that any error which may appear had been of necessity prejudicial to the complaining party.*'" H. R. Rep. No. 913, *supra,* at 2 (quoting H. R. Rep. No. 611, *supra,* at 2) (emphasis added).

The theme that reversal be limited to prejudicial errors is found throughout the legislative history. For example, the Report accompanying the first version of the bill to pass the House of Representatives explained the meaning of the requirement that error be disregarded unless it "affect[s] the substantial rights of the parties" by quoting from an article by President Taft: "'No judgment of the court below should be reversed except for an error which the court, after hearing *[sic]* the entire evidence, can affirmatively say would have led to a different verdict.'" H. R. Rep. No. 1949, 61st Cong., 3d Sess., 1 (1911) (quoting Taft, The Administration of Criminal Law, 15 Yale L. J. 1, 16 (1905)). The Report criticized the practice of reversing judgments for errors which "did not in the least affect the substantial rights of the parties, *the real merits of the case having been properly adjudicated upon the first trial.*" H. R. Rep. No. 1949, *supra,* at 2 (emphasis added). See also, *ibid.* (quoting Justice O'Gorman of the New York Supreme Court to the effect that "[o]ne of the gravest faults with our present mode of trial is the ease and frequency with which judgments are reversed on technicalities which do not affect the merits of the case, and which at no stage of the case have affected the merits"); H. R. Rep. No. 1218, 63d Cong., 3d Sess. (1914); H. R. Rep. No. 264, 64th Cong., 1st Sess. (1916).

Our decision in *Kotteakos* v. *United States, supra,* forecloses any remaining questions as to the interpretation of the phrase "affects substantial rights of the parties." In *Kotteakos,* we expressly rejected the argument that the 1919 Act required a determination of "what are only technical,

what substantial rights; and what really affects the latter hurtfully." 328 U. S., at 761. We held instead that the Act's command to disregard errors unless they "affect the substantial rights of the parties" was a command not to overturn a conviction unless, after examining the record as a whole, the court concludes that an error may have had "substantial influence" on the outcome of the proceeding. *Id.*, at 765. Justice Rutledge's explanation, which includes a description of the proper analysis to apply in evaluating the effect of procedural errors, is well worth repeating:

> "It comes down on its face to a very plain admonition: 'Do not be technical, where technicality does not really hurt the party whose rights in the trial and in its outcome the technicality affects.' . . .
>
> "Easier was the command to make than it has been always to observe. This, in part because it is general; but in part also because the discrimination it requires is one of judgment transcending confinement by formula or precise rule. That faculty cannot ever be wholly imprisoned in words, much less upon such a criterion as what are only technical, what substantial rights; and what really affects the latter hurtfully. Judgment, the play of impression and conviction along with intelligence, varies with judges and also with circumstance. What may be technical for one is substantial for another; what minor and unimportant in one setting crucial in another.

> .      .      .      .      .

> "In the final analysis judgment in each case must be influenced by conviction resulting from examination of the proceedings in their entirety, tempered but not governed in any rigid sense of *stare decisis* by what has been done in similar situations. Necessarily the character of the proceeding, what is at stake upon its outcome, and the relation of the error asserted to casting the balance

for decision on the case as a whole, are material factors in judgment.

.    .    .    .    .

"If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand, except perhaps where the departure is from a constitutional norm or a specific command of Congress. But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand." *Id.*, at 760–765 (citations and footnotes omitted).[1]

II

This interpretation of § 2111 and Rule 52(a) as requiring examination of the prejudicial effect of all procedural errors is subject to several exceptions. First, and most importantly, constitutional errors are governed by the Due Process Clauses of the Fifth and Fourteenth Amendments rather than by § 2111 and Rule 52(a). See *Chapman* v. *California*, 386 U. S. 18 (1967); *United States* v. *Hasting*, 461 U. S. 499 (1983). Thus, the test for harmless constitutional error is stricter than its statutory counterpart. Compare, *Chapman, supra*, at 24 (prosecution must establish that the error

---

[1] It scarcely needs repeating that, since correction may come from the legislature, considerations of *stare decisis* are at their strongest when this Court confronts its previous constructions of a statute. Cf. *Burnet* v. *Coronado Oil & Gas Co.*, 285 U. S. 393, 406–407 (1932) (Brandeis, J., dissenting).

was "harmless beyond a reasonable doubt"), with *Kotteakos*, 328 U. S., at 765 (error is harmless unless it had "substantial influence" on the outcome or leaves one in "grave doubt" as to whether it had such effect).[2]    In addition, Congress may, of course, expressly provide that a particular right is excluded from the operation of the harmless-error rule.    Neither of these exceptions applies to misjoinder in violation of Rule 8, however.    Misjoinder does not ordinarily rise to the level of a constitutional violation,[3] and nothing in the language or

---

[2] Until *Chapman* v. *California*, 386 U. S. 18 (1967), harmless-error analysis was considered inapplicable to errors respecting constitutional rights.    See *id.*, at 42–44 (Stewart, J., concurring in result) ("[I]n a long line of cases, involving a variety of constitutional claims in both state and federal prosecutions, this Court has steadfastly rejected any notion that constitutional violations might be disregarded on the ground that they were 'harmless'" (citing and discussing examples)); see also, *Kotteakos*, 328 U. S., at 764–765, and n. 19.    In *Chapman*, we altered this practice and held that "there may be some constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless, not requiring the automatic reversal of the conviction."    386 U. S., at 22.    Although we have since held that the *Chapman* harmless-error test applies to "most constitutional violations," *United States* v. *Hasting*, 461 U. S., at 509, harmless-error analysis remains inapplicable to many constitutional rights. *E. g.*, *Vasquez* v. *Hillery*, *ante*, p. 254 (discrimination in grand jury selection); *Connecticut* v. *Johnson*, 460 U. S. 73, 84–88 (1983) (opinion of BLACKMUN, J.) (*Sandstrom* violation); *Gideon* v. *Wainwright*, 372 U. S. 335 (1963) (right to counsel); *Tumey* v. *Ohio*, 273 U. S. 510 (1927) (right to impartial tribunal).

Because the source and nature of the harmless-error test for constitutional errors does not derive from § 2111 or Rule 52(a), our cases concerning constitutional errors do not affect, and are not affected by, our decision today, which applies only to the statutory harmless-error doctrine.

[3] But cf. *Bruton* v. *United States*, 391 U. S. 123 (1968).    It is also possible that a particular case of misjoinder may be so egregious as to constitute a deprivation of due process.    If this were the case, the error would be governed by *Chapman* rather than by § 2111 or Rule 52(a).    See n. 4, *infra*.    Of course, a joinder of claims or parties that was so improper as to violate the Due Process Clause would undoubtedly also be prejudicial.

history of either the statutory harmless-error provisions or Rule 8 indicates that Congress chose to except misjoinder from harmless-error scrutiny.[4]

JUSTICE STEVENS' partial dissent recognizes two further exceptions: (1) "when an independent value besides reliability of the outcome suggests that [harmless-error] analysis is inappropriate," and (2) "when the harmlessness of the error cannot be measured with precision." *Post*, at 474. Although the cases he cites to support these additional exceptions involved constitutional errors, JUSTICE STEVENS may well be correct in asserting that they also apply to errors governed by the statutory harmless-error provisions. I need not decide that question to conclude, as does JUSTICE STEVENS, that—like the first two exceptions—neither applies to misjoinder.

The applicability of the exception to protect values other than reliability is easily disposed of. Rules respecting joinder are based on recognition that the multiplication of charges or defendants may confuse the jury and lead to inferences of habitual criminality or guilt by association. *McElroy*, 164 U. S., at 80. Apart from this, however, joinder rules do not serve "an independent value besides reliability of the outcome" justifying an exception to the harmless-error principle. Surely it cannot be maintained that misjoinder affects a right so fundamental to a fair trial that it "'infect[s] the validity of the underlying judgment itself, or the integrity of the process by which that judgment was obtained.'" *Post*, at 474, n. 15 (quoting *Rose* v. *Lundy*, 455 U. S. 509, 544 (1982) (STEVENS, J., dissenting)).

---

[4] As explained above, the 1919 Act was not intended to codify a rule of *per se* reversal for particular rights, much less for misjoinder. Similarly, as the majority points out, nothing in the legislative history of Rule 8 indicates an intent to do anything more then set forth the technical requirements for and limitations on the joinder of claims or defendants. *Ante*, at 444–445, n. 7.

The exception for errors as to which the prejudicial effect cannot be measured with precision requires closer consideration. As previously noted, *McElroy* held that misjoinder is *per se* reversible because a court can never safely conclude that it was not prejudicial. 164 U. S., at 81. However, trial courts routinely inquire into possible prejudice from joint trials when considering motions for severance under Federal Rule of Criminal Procedure 14, and appellate courts just as routinely perform that inquiry in reviewing Rule 14 rulings.[5] To be sure, problems of jury confusion arising from misjoinder may be substantial. It is also quite easy for the jury to be prejudiced by evidence of other crimes or by inferences from an accused's association with other defendants. Thus, it may be that, once the proper test for harmless error is applied, most misjoinders will in fact result in reversal. However, the prejudice that may result from misjoinder is not so difficult to ascertain that it must always be presumed to be present. Whatever force the holding in *McElroy* may once have had, its precedential force has been greatly eroded by the 1919 Act, whose legislative history disapproves of such presumptions, *supra*, at 457–458, and by subsequent decisions such as *Kotteakos*.[6] Today, adherence to the view that misjoinder is *per se* prejudicial would stand out as a stark and unjustified anomaly, leading to just the sort of unnecessary reversals that inspired enactment of the

---

[5] The Court correctly notes in its opinion, see *ante*, at 449–450, n. 12, that while the nature of the inquiry under Rules 8 and 14 is similar, the purposes and scope of these Rules are different.

[6] *Kotteakos* rejected the argument that variance between the indictment and proof at trial should be *per se* reversible because such errors "naturally" result in prejudice. Relying on the legislative history of the harmless-error rule, the Court concluded that such presumptions should not lightly be inferred. "The only permissible presumption," the Court said, "would seem to be particular, arising from the nature of the error and 'its natural effect' for or against prejudice in the particular setting." 328 U. S., at 765–766.

1919 Act. To the extent that *McElroy* states a contrary holding, I would overrule it.

## III

The Court goes on to resolve the harmless-error question. I respectfully dissent. To begin with, I agree with JUSTICE STEVENS that "[u]ndertaking a harmless-error analysis is perhaps the least useful function that this Court can perform." *Post,* at 476. See *United States* v. *Hasting,* 461 U. S., at 520, n. 2 (opinion of BRENNAN, J.); see also, *Connecticut* v. *Johnson,* 460 U. S. 73, 102 (1983) (POWELL, J., dissenting). Having concluded that a harmless-error inquiry is required, I, like JUSTICE STEVENS, think we should remand to the Court of Appeals, which is in a better position than we are to study the complete trial record with care.

Moreover, it is apparent that the Court's perfunctory effort to evaluate the effect of this error is inadequate. The Court tells us simply that the error is harmless "[i]n the face of overwhelming evidence of guilt shown here . . . ." *Ante,* at 450. But where is the "examination of the proceedings in their entirety" called for by *Kotteakos?* See 328 U. S., at 762. *Kotteakos* instructs the reviewing court to "ponde[r] all that happened without stripping the erroneous action from the whole," and expressly states that "[t]he inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error." *Id.,* at 765. Obviously, the existence of overwhelming evidence is relevant to determining the "effect the error had or reasonably may be taken to have had upon the jury's decision." *Id.,* at 764. But I would have thought it equally obvious that, at the very least, consideration of the magnitude of the error in the context of the trial would also be called for; this the Court has not done. The Court also tells us that the error was harmless because the same evidence "would likely have been admissible" at a joint retrial of the defendants without the improper count. *Ante,* at 450. However, as I thought

*Kotteakos* made clear, that is irrelevant. The crucial thing is the effect the error had in the proceedings which actually took place, not whether the same thing could have been done in hypothetical proceedings. See 328 U. S., at 762–765. Harmless-error analysis is not an excuse for overlooking error because the reviewing court is itself convinced of the defendant's guilt. The determination of guilt is for the jury to make, and the reviewing court is concerned solely with whether the error may have had a "substantial effect" upon that body.

Justice Traynor of the California Supreme Court wrote that "the evaluation of an error as harmless or prejudicial is one of the most significant tasks of an appellate court, as well as one of the most complex." R. Traynor, The Riddle of Harmless Error 80 (1970). It is a task this Court is manifestly ill-equipped to undertake. See *United States* v. *Hasting, supra,* at 516–518 (STEVENS, J., concurring in judgment). I would remand the cases for the Court of Appeals to undertake the task.

JUSTICE STEVENS, with whom JUSTICE MARSHALL joins, concurring in part and dissenting in part.

Rule 52(a) of the Federal Rules of Criminal Procedure provides:

> "Harmless Error. Any error, defect, irregularity or variance which *does not affect substantial rights* shall be disregarded." (Emphasis added.)

The question presented in No. 84–744 is whether a misjoinder of defendants prohibited by Rule 8(b) is an error which affects substantial rights.[1] In my opinion, the Court

---

[1] Rule 8(b) of the Federal Rules of Criminal Procedure provides: "Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count."

has answered that question incorrectly; moreover, its opinion unfortunately confuses rather than clarifies the law of "harmless error."

## I

Our central task is, of course, to construe Rule 8(b) of the Federal Rules of Criminal Procedure. Thus, we must consider the history, purpose, and language of that Rule.

Prior to the adoption of the Federal Rules of Criminal Procedure, this Court decided that the misjoinder of defendants, as well as the misjoinder of offenses, was an error that deprived the accused of "a substantial right." *McElroy* v. *United States*, 164 U. S. 76, 80 (1896). *McElroy* concerned both kinds of misjoinder. Five defendants were charged with offenses committed on April 16, 1894, and May 1, 1894, but only three of them were charged with a separate offense committed on April 16, 1894. The two defendants who were not charged with the separate offense made essentially the same objection to their joint trial as did Dennis Lane in this case. As to those two defendants, the Government confessed error and the Court unanimously reversed and remanded for a new trial.[2] As to the other three defendants,

---

[2] "It is clear that the statute does not authorize the consolidation of indictments in such a way that some of the defendants may be tried at the same time with other defendants charged with a crime different from that for which all are tried.

.          .          .          .          .

"It is admitted by the government that the judgments against Stufflebeam and Charles Hook must be reversed . . . ." 164 U. S., at 80.

In confessing error, the Government seemed to concede that reversal was appropriate without any specific showing of prejudice. See Brief for United States in *McElroy* v. *United States*, O. T. 1896, No. 402, p. 6 ("It cannot be certainly affirmed that Stufflebeam and Charles Hook were not embarrassed and prejudiced, in their defense to the indictments under which they stood charged, by the fact that they were compelled to make their defense in a proceeding in which McElroy, Bland, and Hook were prosecuted for arson committed April 16, 1894, which was on the same day of the assaults and fifteen days before the arson for which they were tried").

the majority of the Court held that a misjoinder of offenses had occurred, and required a new trial without any special showing of prejudice. After reviewing the misjoinder of defendants and of offenses, the Court concluded:

> "Necessarily where the accused is deprived of a substantial right by the action of the trial court, such action, having been properly objected to, is revisable on error." *Ibid.*

Thus, almost a half century before the adoption of Rule 8, the Court squarely held that protection against misjoinder was a "substantial right," and that the violation of the misjoinder rule required reversal.

Today, the Court does not dispute that *McElroy* required reversal for misjoinder. Instead, the Court suggests, rather obliquely, that three developments have undermined that holding: (1) the adoption of Rule 8; (2) the adoption of Rule 52(a) and the passage of the harmless-error statute; and (3) the development of a harmless-error doctrine in constitutional law. *Ante*, at 444–446. The reliance on the harmless-error developments will be addressed in more detail. Since we are construing Rule 8, however, the majority's bare citation to it—and apparent reliance on the history of its passage—must be first considered.

The majority seems to be of the view that the adoption of Rule 8 cast doubt on the validity of *McElroy*. *Ante*, at 444. Far from disavowing *McElroy*, however, the Federal Rules continued the misjoinder rule. The notes of the Advisory Committee on Rules state that both subdivisions of Rule 8 represent "substantially a restatement of existing law." Neither the text of Rule 8, nor the Advisory Committee Notes, nor the history of the Rule contains *any* suggestion that Rule 8 was intended to change the rule of the *McElroy* case. Indeed, the Advisory Committee displayed a keen awareness of the *McElroy* precedent by citing the opinion in

its discussion of misjoinder.[3]   At the time the Federal Rules were being considered, moreover, commentators shared the Advisory Committee's view that the Rules merely continued the misjoinder doctrine in its then current form, and restated existing law.[4]   The principle that misjoinder deprives the accused of "a substantial right" and therefore is "revisable on error" thus remained the law when the Federal Rules of Criminal Procedure became effective in 1946.

Furthermore, if one reads Rule 8 in conjunction with Rule 14, it is immediately apparent that the draftsmen of the Rules regarded every violation of Rule 8 as inherently prejudicial.   For Rule 14 authorizes the Court to grant a severance, even in the absence of a Rule 8 violation, if either the defendant or the Government is prejudiced by a joinder of offenses or defendants.[5]   Thus, it seems clear that the draftsmen of the Rules regarded violations of Rule 8 as inherently prejudicial, and recognized that even joinders that were not prohibited by the Rule should be forbidden if a party

---

[3] See 5 Federal Rules of Criminal Procedure: Documentary History, Second Preliminary Draft, Feb. 1944, Note to Rule 8, pp. 35–36 ("Since the counts of two or more indictments consolidated for trial, under 18 U. S. C. § 557, are 'put . . . in the same category as if they were separate counts in one indictment,' *McElroy* v. *United States,* 164 U. S. 76, 77 (1896), this type of joinder is more widely practiced than is generally realized").

[4] See Maguire, Proposed New Federal Rules of Criminal Procedure, 23 Ore. L. Rev. 56, 59 (1943) ("Subdivision (b) of Rule 9 provides for a joinder of defendants where they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting or resulting in an offense, and that they may be charged in one or more counts, together or separately, in any manner indicating their respective participation in the offense or offenses. . . . This rule merely restates the present Federal statute . . ."). "Rule 9" became the current "Rule 8" without substantial change.   See Orfield, Joinder in Federal Criminal Procedure, 26 F. R. D. 23, 28–29 (1960).

[5] Rule 14 provides, in pertinent part: "If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires."

could demonstrate actual prejudice. This is the way Professor Charles Wright interpreted the intent of the draftsmen in his 1969 treatise. He wrote:

> "Indeed there would be no point in having Rule 8 if the harmless error concept were held applicable to it. If that concept could be applied, then defendant could obtain reversal only if the joinder were prejudicial to him. But Rule 14 provides for relief from prejudicial joinder, and a defendant can obtain a reversal, in theory at least, if he has been prejudiced even though the joinder was proper. If misjoinder can be regarded as harmless error, then reversal could be had only for prejudice whether the initial joinder was proper or improper. If that were true, it would be pointless to define in Rule 8 the limits on joinder, since it would no longer be of significance whether those limits were complied with, and the draftsmen would have been better advised to allow unlimited joinder of offenses and defendants, subject to the power of the court to give relief if the joinder were prejudicial." 1 C. Wright, Federal Practice and Procedure, § 144, p. 329 (1969).[6]

Other commentators have agreed that the structure of the Federal Rules strongly supports the conclusion that the draftsmen viewed a violation of the misjoinder rule as inherently prejudicial.[7]

---

[6] In his current edition, Professor Wright notes that a number of federal courts have held that misjoinder may be harmless error, but he concludes that "there remains much to be said for what was once the almost-unanimous view that misjoinder is never harmless error." 1 C. Wright, Federal Practice and Procedure: Criminal, § 145, p. 532 (2d ed. 1982).

[7] See Note, Harmless Error and Misjoinder Under the Federal Rules of Criminal Procedure: A Narrowing Division of Opinion, 6 Hofstra L. Rev. 533, 544, n. 65 (1978) ("Implicit in the assertion that rule 8 sets the limits of tolerable prejudice is the argument that if its purpose is not to set such limits there is no purpose in the rule. Rule 14 would vest all questions of joinder in the trial court. . . . As both rule 14 and rule 8 were included in the rules, rule 8 must have been intended to establish the outer bounds

Thus, a review of the state of the law of joinder at the time the Federal Rules of Criminal Procedure were adopted, of the Advisory Committee's intent to restate then-existing law, and of the text of the Rules themselves requires a conclusion that a Rule 8 misjoinder violation is an error that affects the substantial rights of the accused and therefore requires reversal of a conviction.

## II

In addition to its unexplained reference to the adoption of Rule 8, the Court suggests that its new misjoinder rule—that prejudice must be shown to justify reversal of a Rule 8 misjoinder error—is supported by its interpretation of developments in the law of "harmless-error." Specifically, the Court observes that the *McElroy* approach has been undermined by the passage of a harmless-error statute and rule, *ante*, at 444, and by the development of a harmless-error doctrine for constitutional errors, *ante*, at 445. Although the majority does not distinguish between these two categories, they require separate analysis. Neither category, however, remotely supports the majority's bald assertion that misjoinder should not be viewed as affecting "substantial rights," and thus not be viewed as inherently prejudicial.

The majority refers to the current harmless-error statute, 28 U. S. C. § 2111, and to Rule 52(a). As the majority points out, both define harmless error in terms of whether a violation affects "substantial rights."[8] Since this Court had already made clear that misjoinder affected "substantial

within which the trial court has discretionary power under rule 14"). In my view, the majority's discussion of this issue, *ante*, at 449–450, n. 12, fails to answer this straightforward reading of Rule 8 and Rule 14.

[8] See 28 U. S. C. § 2111 ("On the hearing of any appeal or writ of certiorari in any case, the court shall give judgment after an examination of the record without regard to errors or defects which do not affect the substantial rights of the parties"); Fed. Rule Crim. Proc. 52(a) ("Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded").

rights," *McElroy*, 164 U. S. 76 (1896), it is curious that the majority concludes, with no support at all, that the passage of a statute and Rule which allowed for correction of errors that did not affect "substantial rights" somehow changed the legal status of a violation that had been described in precisely those words. This view is especially curious when it is remembered that the Rule governing joinder was viewed by the draftsmen as a restatement of existing law.

To be sure, *McElroy* was decided before the first harmless-error statute was passed in 1919. That statute, a reaction to the hypertechnicality that had developed in American jurisprudence, did mark a significant change in our system's view of the effect of error.[9] But it is a long leap from that recognition to a view that the passage of the harmless-error statute in 1919—and the subsequent adoption of Rule 52(a) in 1946 and the passage of the current harmless-error statute in 1949—summarily jettisoned all prior jurisprudence on the errors that affected "substantial rights." Indeed, interpretations of the 1919 statute accorded it a very different mission. As Justice Frankfurter explained in refusing to require a showing of prejudice to justify reversal for a statutory violation: "Suffice it to indicate, what every student of the history behind the Act of February 26, 1919, knows, that that Act was intended to prevent matters concerned with the mere etiquette of trials and with the formalities and minutiae of procedure from touching the merits of a verdict." *Bruno* v. *United States*, 308 U. S. 287, 294 (1939). And, while Rule 52(a) and the 1949 harmless-error statute were changed in a way that some commentators have found significant,[10] the

---

[9] For a discussion of the background of the 1919 statute, see *Kotteakos* v. *United States*, 328 U. S. 750, 758–760 (1946).

[10] The 1919 statute referred to "*technical* errors, defects, or exceptions which do not affect the substantial rights of the parties." 40 Stat. 1181, 28 U. S. C. § 391 (1946 ed.) (emphasis added). Rule 52(a) referred to "[a]ny error, defect, irregularity or variance which does not affect substantial rights"; the 1949 statute referred to "errors or defects which do not affect the substantial rights of the parties." 28 U. S. C. § 2111. See Note, 6

continuation of "substantial rights" as the benchmark for assessing the harmlessness of error provides no support for the proposition that anyone intended to change something that had been found to affect a "substantial right" into something that did not affect a substantial right.

Thus, neither the harmless-error statute, passed within a few years of the adoption of Rule 8, nor Rule 52(a), adopted at the same time as Rule 8, changed the interpretation of the misjoinder rule reflected in Rule 8.

The harmless-error statute and Rule are, however, at least relevant to the inquiry at hand. In contrast, the majority's reliance on *Chapman* v. *California*, 386 U. S. 18 (1967), *ante*, at 445, is plainly misplaced. The majority observes: "Clearly, *Chapman* and *Hasting* dictate that the harmless-error rule governs here." *Ante*, at 446. Nothing could be less clear. This case does not involve a claim of constitutional error. The harmless-error doctrine that was enunciated in *Chapman* thus does not settle the issue raised by this case. Simply because constitutional errors may be subject to a harmless-error inquiry does not mean that all nonconstitutional errors must be subject to harmless-error analysis, and this Court has never so held.[11] Rather, our mission in

Hofstra L. Rev., *supra* n. 7, at 540 (discussing possible significance of change). But cf. H. R. Rep. No. 352, 81st Cong., 1st Sess., 18 (1949) (new harmless-error statute intended to "incorporate" former harmless-error statute); Rule 52(a), Notes of Advisory Commitee on Rules, 18 U. S. C. App., p. 657 (Rule intended as "a restatement of existing law"); *Kotteakos*, 328 U. S., at 757, n. 9 (citing Advisory Committee comment that Rule 52(a) was intended as " 'a restatement of existing law' ").

[11] That the Court has recognized the difference between constitutional and nonconstitutional harmless-error inquiries is reflected in the considerable difference in the Court's standards on these two subjects. Compare *Chapman*, 386 U. S., at 24 ("before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt"), with *Kotteakos* v. *United States*, 328 U. S., at 765 (in nonconstitutional cases, "[t]he inquiry . . . is . . . whether the error itself had substantial influence"). To the extent that the majority ultimately cites the *Kotteakos* standard as governing this case, *ante*, at

reviewing nonconstitutional errors is, first, to discern whether the rule or statute which is being violated was intended to be subject to harmless-error analysis. If there is a definitive answer to that question, our inquiry should be at an end.[12] If there is no definitive answer, then we must try to assess the rule or statute in question in light of the purpose of the harmless-error rule and statute. We should not, however, rewrite existing law by adopting a presumption that, simply because a violation is nonconstitutional, it is automatically subject to harmless-error inquiry.

As the majority observes, the Court's willingness to invoke the harmless-error doctrine has expanded dramatically in recent years. This expansion is a source of considerable concern,[13] particularly because the Court has often been unclear and imprecise in its increasingly frequent invocation of harm-

---

449, it is consistent with this distinction in our case law; to the extent that the majority suggests that *Chapman* controls the outcome of this case, however, *ante,* at 446, it reveals confusion about this distinction.

[12] Cf. *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.,* 467 U. S. 837, 842–843 (1984) ("If the intent of Congress is clear, that is the end of the matter; for the court . . . must give effect to the unambiguously expressed intent of Congress").

[13] See Comment, Harmless Error: Abettor of Courtroom Misconduct, 74 J. Crim. L. & C. 457, 475 (1983) ("The harmless error standards as currently applied in review of criminal trials are eroding the integrity of the criminal justice system by encouraging violations of longstanding trial rules"); Goldberg, Harmless Error: Constitutional Sneak Thief, 71 J. Crim. L. & C. 421, 422 (1980) ("the doctrine of harmless constitutional error destroys important constitutional and institutional values"); Note, Harmful Use of Harmless Error in Criminal Cases, 64 Cornell L. Rev. 538, 540 (1979) ("increased use of harmless error analysis is inherently dangerous regardless of whether the errors violate the Constitution, statutes, or the common law") (footnotes omitted); Cameron & Osborn, When Harmless Error Isn't Harmless, 1971 Law & Social Order 23, 42 ("while the harmless error doctrine is an extremely useful device . . . it is not one that is without its dangers"). Cf. *United States* v. *Jackson,* 429 F. 2d 1368, 1373 (CA7 1970) (Clark, J., sitting by designation) ("'Harmless error' is swarming around the 7th Circuit like bees. . . . [T]he courts may have to act to correct a presently alarming situation").

less error.[14]   In my view, harmless-error analysis is inappropriate in at least three situations: (1) when it is clear that a statute or Rule was not intended to be subject to such a rule; (2) when an independent value besides reliability of the outcome suggests that such analysis is inappropriate;[15] and (3) when the harmlessness of an error cannot be measured with precision.[16]   In my view, misjoinder clearly falls into the first

[14] See Field, Assessing the Harmlessness of Federal Constitutional Error—A Process in Need of a Rationale, 125 U. Pa. L. Rev. 15, 32 (1976) ("In sum, the case law on the content of the harmless error standard is less than lucid.   There is some indication that Supreme Court opinions slip back and forth from one suggested standard to another, without explicit notice of the change, though the change could produce different results in many cases"); Saltzburg, The Harm of Harmless Error, 59 Va. L. Rev. 988 (1973) ("Chaos surrounds the standard for appellate review of errors in criminal proceedings"); Mause, Harmless Constitutional Error: The Implications of Chapman v. California, 53 Minn. L. Rev. 519, 557 (1969) ("the Court, if only in an effort to further the interest of net judicial economy, should attempt to delineate certain well-defined classes of constitutional error which require automatic reversal").

[15] In the constitutional area, the Court has made clear that certain independent values render a harmless-error analysis inappropriate.   See, e. g., Rose v. Mitchell, 443 U. S. 545 (1979) (racial discrimination in the selection of a grand jury is not subject to harmless-error analysis); Chapman, 386 U. S., at 23 ("there are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error"). Cf. Rose v. Lundy, 455 U. S. 509, 544 (1982) (STEVENS, J., dissenting) (some constitutional errors "are so fundamental that they infect the validity of the underlying judgment itself, or the integrity of the process by which that judgment was obtained").

[16] In Holloway v. Arkansas, 435 U. S. 475, 491 (1978), CHIEF JUSTICE BURGER explained that harmless error was inappropriate in assessing the constitutional error of inappropriate joint representation in part because such an inquiry required "unguided speculation."   See also Note, 64 Cornell L. Rev., supra n. 13, at 563–564 ("Holloway's rationale naturally extends beyond the sixth amendment: it suggests that a rule of automatic reversal should apply to those fundamental, pervasive errors that have uncertain prejudicial impact. . . . The rule of automatic reversal should be extended to all errors, whether or not pervasive or constitutional, that result in unascertainable prejudice") (footnotes omitted).

category. It also has elements of the second and third. Misjoinder implicates the independent value of individual responsibility and our deep abhorrence of the notion of "guilt by association." Our criminal justice system has expanded considerably in its tolerance of multiple joinders and massive conspiracy trials. The rule against misjoinder remains, however, as an ultimate safeguard of our cherished principle that one is tried for one's own deeds, and not for another's.[17] The harmfulness of misjoinder is also the type of error that has consequences that are difficult to measure with precision.[18] These concerns may or may not outweigh the societal interests that motivate the Court today, but they are surely strong enough to demonstrate that the draftsmen of the Federal Rules acted responsibly when they adhered to the time-honored rule of the *McElroy* case. The misjoinder Rule that they crafted is clear, and should be respected.[19] Misjoinder affects "substantial rights," and should lead to reversal.

[17] Cf. *Krulewitch* v. *United States*, 336 U. S. 440, 457–458 (1949) (Jackson, J., concurring) ("Few instruments of injustice can equal that of implied or presumed or constructive crimes. The most odious of all oppressions are those which mask as justice").

[18] See Note, 6 Hofstra L. Rev., *supra* n. 7, at 563 (harmless error "is inaccurate as a test for ascertaining the prejudice resulting from misjoinder because of the impossibility of determining the extent of that prejudice").

[19] The majority's suggestion that two Supreme Court opinions have held misjoinder subject to the harmless-error rule is erroneous. The majority writes: "A holding directly involving misjoinder again indicated the harmless-error rule should apply." *Ante*, at 447. The decision cited by the majority for this proposition, *Schaffer* v. *United States*, 362 U. S. 511 (1960), explicitly found no Rule 8 error and explicitly disavowed the type of "indication" claimed by the majority. See 362 U. S., at 517 ("The harmless-error rule, which was the central issue in *Kotteakos*, is not even reached in the instant case, since here the joinder was proper under Rule 8(b) and no error was shown"). Thus, the majority's discussion of *Schaffer*, *ante*, at 447–448, is completely beside the point. Indeed, one year after *Schaffer* was decided, it was read to support, not the majority's conclusion, but the viability of the *McElroy* rule. See *Ward* v. *United States*, 110 U. S. App. D. C. 136, 137, 289 F. 2d 877, 878 (1961) (Burger,

## III

Undertaking a harmless-error analysis is perhaps the least useful function that this Court can perform, cf. *United States v. Hasting*, 461 U. S. 499, 516–518 (1983) (STEVENS, J., concurring in judgment). For that reason, a decision that a harmless-error inquiry is required should lead to a remand to the Court of Appeals, which is in a far better position than we are to study the complete trial record with care. The majority's opinion in this case confirms the general advisability of that approach.

The Court's conclusion that Dennis Lane suffered no prejudice is based on three cursory observations. First, the Court asserts, with no explanation, that there was "overwhelming evidence" of his guilt. *Ante*, at 450. There are at least two problems with this observation. The first is that the majority fails to appreciate the *Kotteakos* recognition that the harmless-error inquiry is entirely distinct from a sufficiency-of-the-evidence inquiry.[20] The second is that,

---

J.) (citing *Schaffer* and *McElroy* to reject Government suggestion that defendant must show prejudice to obtain reversal after misjoinder of defendants has been established).

Similarly, the majority's claim that *Kotteakos* "suggested that the harmless-error rule could similarly apply" to misjoinder, *ante*, at 447, vastly overstates the case. The Court noted that a possible joinder violation gave added weight to its conclusion that the error before it was *not* harmless. 328 U. S., at 774–775. The Court observed that "§ 269 [the harmless-error statute] carries the threat of overriding the requirement of § 557 for substituting separate counts in the place of separate indictments, unless the application of § 269 is made with restraint. The two sections must be construed and applied so as to bring them into substantial harmony, not into square conflict." *Id.*, at 775. This expression of concern about the possible effect of harmless error on misjoinder, however, hardly supports the notion that *Kotteakos* held misjoinder subject to harmless-error analysis. And, despite the majority's view that its holding is the only way to bring harmless error and misjoinder into "substantial harmony," *ante*, at 449, a conclusion that misjoinder necessarily affects substantial rights produces the same harmony.

[20] In *Kotteakos*, the Court accepted the defendants' concession that the evidence was not "insufficient, if considered apart from the alleged errors

even if it were faithfully applying the *Kotteakos* distinction between sufficiency of the evidence and harmless error, the majority utterly fails to explain its statement about "overwhelming evidence." A reading of *Kotteakos* reveals that only the most painstaking and thorough review of an entire trial record can justify a conclusion that its standard has, or has not, been met. The opinion the Court announces today contains no indication that it has made that kind of analysis of the case against Dennis Lane.[21]

Second, the Court notes that the jury was properly instructed to evaluate the evidence under each count and against each defendant separately. Since that instruction should be given routinely in every case in which there is a joinder of defendants or offenses, it surely cannot be regarded as an adequate response to a claim that a misjoinder was prejudicial.[22]

---

relating to the proof and the instructions at the trial." 328 U. S., at 753. The Court went on to emphasize that the harmless-error analysis is fundamentally different from the sufficiency analysis. "The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand." *Id.*, at 765. Even though the evidence was concededly sufficient without the errors, the Court thus found the errors not harmless, and the convictions reversible. The majority quotes the relevant passage from *Kotteakos, ante*, at 449, but fails to reflect its principle in its analysis.

[21] The only specific evidence even mentioned by the majority—the testimony of Heard and Lankford, *ante*, at 450–451, n. 13—represents accomplice testimony. Such testimony is, of course, generally recognized as posing special evidentiary problems. See, *e. g.*, 1 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 107 [04], pp. 107–50—107–51 (1985); 3 S. Gard, Jones on Evidence § 20:60, pp. 736–737 (6th ed. 1972).

[22] Indeed, in the year following *Kotteakos*, this Court made clear that proper jury instructions might not alleviate the problems inherent in joint trials:

"The grave danger in this case, if any, arose not from the trial court's rulings upon admissibility or from its instructions to the jury. As we have said, these were as adequate as might reasonably be required in a joint trial. The danger rested rather in the risk that the jury, in disregard of

Finally, the Court rather hesitantly suggests that the evidence on Count 1 "would likely have been admissible" in a joint retrial on Counts 2–6, *ante*, at 450. The Court thus assumes that a joint retrial is inevitable. Of course, if misjoinder is found only as to Dennis Lane, as I suggest below, then the majority's point collapses. In any event, nothing in *Kotteakos* or in our harmless-error precedents suggests that this Court should find an error harmless because of the Court's completely untested speculations about a possible future retrial. Not surprisingly, *Kotteakos* suggests precisely the opposite.[23]

A determination that an error was harmless is an extremely weighty conclusion; it implicates profound notions of fairness and justice.[24] Even if the majority is correct that Rule 8 misjoinder should be subject to harmless-error analysis, I am convinced that the majority's summary finding of harmless error in this case fails to give the issue the attention it deserves.[25]

the court's direction, would transfer, consciously or unconsciously, the effect of the excluded admissions from the case as made against Goldsmith and Weiss across the barrier of the exclusion to the other three defendants." *Blumenthal* v. *United States*, 332 U. S. 539, 559 (1947).

[23] "The Government's theory seems to be, in ultimate logical reach, that the error presented by the variance is insubstantial and harmless, if the evidence offered specifically and properly to convict each defendant would be sufficient to sustain his conviction, if submitted in a separate trial. For reasons we have stated and in view of the authorities cited, this is not and cannot be the test under § 269 [the harmless error statute]." 328 U. S., at 767.

[24] See R. Traynor, The Riddle of Harmless Error 80 (1970) ("[T]he evaluation of an error as harmless or prejudicial is one of the most significant tasks of an appellate court, as well as one of the most complex. Each evaluation bears upon our traditional understanding that fair trial encompasses not only fair notice and an adequate opportunity to be heard before the appropriate tribunal, but also an orderly presentation of evidence and a rational application of the law thereto").

[25] A more searching review of the record might require the majority to confront certain troublesome aspects of this erroneous joinder. The majority might have to confront the fact that at least 9 of the Government's 26

## IV

I agree with the Court's conclusion that the evidence was sufficient to sustain both convictions of mail fraud and therefore join Part III of its opinion. I also agree with the judgment insofar as it upholds the conviction of James Lane. It is perfectly clear that the violation of Rule 8(b)—the rule prohibiting the improper joinder of *defendants*—occasioned by the misjoinder of Count 1 did not affect James Lane because he was the defendant in Count 1. But since there is no claim that the son, Dennis Lane, took any part in Count 1 (the mail fraud regarding the 1979 El Toro Restaurant fire), I believe that his right not to be joined as a defendant in his father's trial for that felony was a "substantial right" that was adversely affected by the misjoinder.

In my view, the Court's opinion misconstrues the history and purpose of Rule 8, sows further confusion in the Court's

---

witnesses—more than one third—addressed the El Toro fire, the offense for which Dennis Lane was not charged. See Testimony of Morris Loewenstern, Tr. 33–43; Testimony of Earl Simpson, *id.*, at 44–50; Testimony of Cindy Wright, *id.*, at 58–59; Testimony of David Lard, *id.*, at 62–89, 96–103; Testimony of Ben Shaw, *id.*, at 103–112; Testimony of Jack Stotts, *id.*, at 113–123; Testimony of Wayne Cox, *id.*, at 123–132; Testimony of Jay Messenger, *id.*, at 139–157; and Testimony of Sidney Heard, *id.*, at 230–243. It might have to confront the fact that two of the defense witnesses similarly focused on the El Toro fire. See Testimony of Janie Malone, *id.*, at 681–736; Testimony of Jess Maddox, *id.*, at 891–894. It might have to confront the fact that, in their closing arguments, both the Government and the defense counsel devoted considerable attention to the El Toro fire. See Government's closing argument, *id.*, at 989–993; defense's closing argument, *id.*, at 1008–1014. And it might, finally, have to confront the fact that the prosecutor's closing words to the jury were that "*each* of these charges has been proved against J. C. Lane *and Dennis Lane* beyond a reasonable doubt." *Id.*, at 1051 (emphasis added).

This is not to say that I have studied the record with sufficient care to conclude that, if misjoinder is subject to harmless-error analysis, the error here was not harmless. Rather, it is to say that I am convinced that the majority's opinion gives no indication of having wrestled with the complexities of the 1,000-page trial transcript in a manner that would permit its confident assertion that the error was harmless.

harmless-error jurisprudence, and fails to make the kind of harmless-error analysis that Rule 52(a) requires. Because I do not consider these errors harmless, I respectfully dissent from the judgment regarding Dennis Lane in No. 84–744.