UNITED STATES

v.

**Raymond P. GIBSON, 244 21 7158 Midshipman First Class (M–1), U.S. Navy.**

**NMCM 92 0501.**

U.S. Navy–Marine Corps Court of Military Review.

Sentence Adjudged 14 Aug. 1991.

Decided 14 Oct. 1992.

William M. Ferris, Civilian Defense Counsel.

LT Matthew L. Kronisch, JAGC, USNR, Appellate Defense Counsel.

LT Richard J. Huber, JAGC, USNR, Appellate Government Counsel.

Before FREYER, REED and MOLLISON, JJ.

FREYER, Senior Judge:

The appellant, a midshipman at the U.S. Naval Academy, was tried by a general court-martial with members on two specifications of carnal knowledge of one C.A., a twelve-year-old girl, in violation of Article 120, Uniform Code of Military Justice (UCMJ), 10 U.S.Code § 920. He was found guilty under each specification, by exceptions and substitutions, of taking indecent liberties with C.A. by fondling her and placing his hands on her private parts with intent to gratify his sexual desires, in violation of Article 134, UCMJ, 10 U.S.Code § 934. He was sentenced on 14 August 1991 to dismissal from the naval service, forfeiture of all pay and allowances, and confinement for one year. The convening authority, on 28 February 1992, approved the sentence but deferred the confinement until the conviction should become final.[1]

The most troublesome issue in this appeal arises from an instruction given by the military judge, to which exception was duly taken, allowing the members to consider as substantive evidence on the merits hearsay statements by C.A., inconsistent with her testimony, that had been admitted solely for impeachment pursuant to Military Rule of Evidence (M.R.E.) 613. The Government, which induced the error at trial by requesting the instruction, concedes on appeal that the instruction was erroneous but contends that the error was harmless. Because C.A. (the declarant) was present and testified subject to cross-examination, we must apply the standard of harmless error applicable to errors of less than constitutional dimension. See *California v. Green,* 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970). A discussion of the pertinent facts is necessary.

The U.S. Naval Academy has a sponsorship program under which midshipmen are assigned, presumably on a voluntary basis, to local families willing to act as sponsors.

The appellant, a midshipman at the U.S. Naval Academy, was assigned to the A. family. It appears from the record that the appellant and other midshipmen sponsored by the A. family had keys to the A. family's house, often slept and studied there over week-ends, and were treated in most respects as members of the family.

The A. family had a twelve-year-old daughter, C.A. At first, the relationship between the appellant and C.A. was, and appeared to be, that of big brother and little sister, but, as time went on, that relationship, in the opinion of Mrs. A., began to change. It appeared to her that C.A. had developed a "crush" on the appellant. On one occasion she saw the appellant and C.A. emerge from C.A.'s bedroom from behind a closed door. On another, she found them downstairs on the floor of the family room in the middle of the night, and C.A. "kind of jumped up" upon being discovered there by her mother.

One day, while cleaning C.A.'s room, Mrs. A. found a letter written by C.A. addressed to the appellant. The letter is not in evidence, but its contents caused Mrs. A. to cry for three to four hours, to inform Mr. A., and to telephone the appellant at his family's residence in Memphis, Tennessee, where he had gone on vacation. The following excerpts from the transcript of the direct examination of Mrs. A. reveal the substance of her telephone conversations with the appellant.

Q. What happened next?

A. I said, "I want to know what happened. Were you intimate with my daughter?"

Q. Did he respond to that question?

A. Sort of.

Q. What did he say?

A. He said, "Sort of." I said, "What do you mean, sort of?" "Sort of." "Were you intimate with my daughter or not?" "Sort of." "Sort of how, Raymond?" "Touching. Maybe kiss-

---

[1]. It appears from the allied papers that the appellant was actually serving his sentence to confinement before the convening authority acted; in any event, since the confinement was not deferred until 28 February 1992, the deferment necessarily relates only to confinement remaining unserved on that date.

ing. Maybe fondling or something," he said. He didn't say he was sexually intimate with her. Touching and kissing, that's what he told me.

Q. Did anything occur after that?

A. I said, "Raymond, I want you to go tell your father exactly what you told me. And once you have finished talking to your father, I want you to call me back."

(Record at 102.)

The appellant called back about fifteen or twenty minutes later:

Q. Excuse me. What did Ray say to you at that time?

A. When?

Q. On the second conversation?

A. The second conversation, we had a conversation and then I just said, "I want to know the truth. Were you intimate with my daughter?"

Q. And do you recall what Raymond's response was?

A. Yes. He said, "Yes." I said, "Ray." "When?" He said, "About a month ago." I said, "How many times?" "Twice." I said, "Ray, twice." I said, "You're talking about a twelve year old." I said, "When?" He said, "About a month ago." I said, "When was this other time?" "Maybe two weeks after that." I said, "I trusted you. I gave you a key to my house. I brought you into my house and I didn't know you from Adam. And this is how you pay me back. My daughter is 12 years old."

(Record at 103.)

Mrs. A. confronted C.A. when she came home from school. They went out to a park, and it was there that C.A. made the statements which were admitted solely for impeachment but which the military judge later instructed could be considered as substantive evidence. C.A. related to her mother that she had twice "had sex" with the appellant; that no one was supposed to find out; that she could not have gotten pregnant because the first time she had her period and the second time he had a condom; that one time it was downstairs in the basement and the other time upstairs in the bedroom; that the first time it happened, she made him stop because it "hurt too bad," and the second time it still hurt, although people told her that it wasn't supposed to hurt the second time. Mrs. A. opined that her daughter was in love with the appellant.

An ensign who had been the appellant's roommate in his first year at the U.S. Naval Academy and had also been sponsored by the A. family testified that the appellant had telephoned him before their prospective graduation from the Academy and said that he had gotten himself into a lot of trouble and was not going to graduate; that he was being investigated for statutory rape of their sponsor's daughter; and that he was very upset and was going to commit suicide. From the transcript of the direct examination:

Q. Did he say anything else?

A. I asked him some questions about how did he get himself into this kind of situation and that kind of stuff.

Q. Do you recall specifically what you asked him?

A. I asked him how it happened.

Q. Did he respond to that?

A. Yes, sir, he said it just kind of happened. He didn't even know how it happened, it just happened.

Q. When he was referring to "it kind of happened," what was he referring to, if you know?

A. He was referring towards sex, sir.

Q. Is that something that he said or that something that you concluded from what he had said?

A. That's something that he said, sir.

(Record at 117.)

C.A. was examined by a medical doctor, who testified that she had two healed small lesions in the area of the hymenal ring appearing to be recent scars; that he could not say how the tears were received; that they, together with the absence of other trauma signs, were consistent with intercourse, but that they could have occurred in some other way.

For her part, C.A. was called as a prosecution witness and adamantly denied any

sexual contact with the appellant. She was vigorously examined by the trial counsel with respect to a prior inconsistent statement she had made under oath to a Naval Investigative Service (NIS) agent to the effect that the appellant had, on one occasion, "French-kissed" her, fondled her breast through her clothing, and reached inside her pants to enter her vagina with his finger, and, on the other occasion, partially entered her vagina with his penis but desisted and withdrew when it caused C.A. too much pain.

C.A. had been called as a witness at the appellant's Article 32 investigation and there adopted her NIS statement as her testimony; on that basis, the trial counsel offered the NIS statement under M.R.E. 801(d)(1)(A), but the military judge rejected it under that rule, allowing it to be used only as a basis for questioning C.A. for the purpose of impeachment under M.R.E. 613. That ruling was enforced with a proper limiting instruction. C.A. was also impeached with prior inconsistent statements made to friends and the statement made to her mother described in detail above. She offered various explanations for these statements but persisted in her denials of any sexual contact.

The trouble started in an Article 39(a) session on instructions, when the trial counsel requested an instruction on prior consistent statement—recent fabrication (Record at 140), to which the appellant's civilian counsel promptly objected. Apparently, the trial counsel's theory was that, because C.A. had made prior out-of-court statements which were consistent with each other, that proved that her in-court testimony which was inconsistent with her prior out-of-court statements was a recent fabrication. That may be true, but it has no resemblance to the rule of evidence which the requested instruction is designed to implement, as the civilian counsel clearly explained on the record (Record at 141).

The military judge took the matter under advisement and ultimately gave the following pair of instructions:

You have heard evidence that the alleged victim [C.A.] made a statement prior to trial that may be inconsistent with her testimony at this trial. Specifically, that the prior statement indicated that sexual contact had occurred between her and the accused. Then you heard her indicate here under oath that those things did not occur. If you believe that an inconsistent statement was made, you may consider the inconsistency in evaluating the believability of the testimony of [C.A.]. You may not, however, consider the prior statement as evidence of the truth of the matters contained in that prior statement.

(Record at 162.)

You also heard evidence that [C.A.] made a statement prior to trial that may be consistent with her testimony at this trial. Specifically, that she told her friends and her mother that she had had these prior sexual contacts with the accused, just as she had allegedly indicated to NIS that they had occurred. If you believe that such a consistent statement was made, you may consider it for its tendency to refute the charge of recent fabrication or improper motives. You may also consider the prior consistent statement as evidence of the truth of the matter expressed therein.

(Record at 163.)

Although it is not expressly stated, it appears by the process of elimination that the first-quoted instruction refers to the statement given by C.A. to the NIS agent, which is in the record as Prosecution Exhibit 1 for identification. The second-quoted instruction, referring to non-specific inculpatory statements made by C.A. to her friends and the inculpatory statements made by her to her mother, concerning which her mother was permitted to testify, makes no sense in the context of this case, but its potential prejudice consists in placing before the members for their full consideration the prior inconsistent statements made by C.A. to her friends and her mother, which had been entertained solely under M.R.E. 613.

In fact, there are some prior consistent statements in the record. C.A. testified that, after telling her friends that sexual

contacts had occurred between herself and the appellant, she told them following the Article 32 investigation that "it wasn't true." (Record at 55–56.) She also testified that, during the month preceding trial, she had told her mother that her NIS statement was not true, and that she and the appellant "didn't do nothing" and that it did not happen. (Record at 56, 81.) To some degree, then, the second-quoted instruction may have distracted the members from the real prior consistent statements, which, depending on when a motive to misrepresent is deemed to arise, may have had some minimal potential for rebutting the prosecution's charge of recent fabrication.

Having thus identified the nature of the instructional error, we must now assess its likely impact on the trial, using the appropriate standard for error of less than constitutional dimension. We pause to examine that standard.

The standard for non-constitutional harmless error comes from the leading case of *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). Although it cannot do justice to the opinion in that case to quote less than copious portions thereof, the essence of the harmless error standard is captured in the following paragraph:

> If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand.... But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.

328 U.S. at 764–65, 66 S.Ct. at 1248.

Reviewing the substantive evidence which the members might properly have considered on the merits, we have C.A.'s testimony, which, although it was a categorical denial of wrongdoing, was, in our view, thoroughly impeached. While such impeachment did not convert her denials into affirmative evidence of guilt, her testimony was not entirely devoid of corroborating evidence of guilt, as explained at page 11 of the Government brief. The testimony of the medical doctor indicated that some trauma had occurred to C.A.'s vaginal area. Ensign Jorgenson's testimony indicated that the appellant, when in a state of mind in which he might be expected to tell the truth, admitted to the ensign that sex between himself and C.A. had "happened"; and, however distressing false charges of sexual misconduct may be, it seems to us more likely that the appellant's suicidal ideations would have resulted from consciousness of guilt than from false accusations. The most damaging admissions made by the appellant were those recounted in the testimony of Mrs. A. Although words like "intimate" and "fondling" can have non-sexual as well as sexual connotations, it would defy common understanding to interpret them otherwise than as having sexual connotations on the state of this record.

Probably the clearest indicium of the harmlessness of the instructional error is the members' findings, themselves. By twice finding the appellant not guilty of carnal knowledge, the members demonstrated that they were unwilling to credit the out-of-court declarations of C.A. to her mother and friends to the degree necessary for proof beyond a reasonable doubt. On the other hand, evidence to support the findings they did make comes primarily from the appellant's own corroborated admissions. After a careful review of the entire record, we are convinced that the erroneous instruction did not have a substantial and injurious effect nor influence in determining the members' findings. *See United States v. Lane*, 474 U.S. 438, 449, 106 S.Ct. 725, 732, 88 L.Ed.2d 814 (1986). *A fortiori*, we are convinced that the admission for impeachment purposes of the declarations to which the erroneous instruction related, in apparent violation of

*United States v. Button,* 34 M.J. 139 (C.M.A.1992), likewise did not have a substantial and injurious effect nor influence in determining the members' findings. In applying the test for harmless error, we have taken care to avoid any consideration of evidence that might have been, but was not, admitted as substantive evidence or that might be so admitted upon a rehearing, or the probable outcome thereof. *See Kotteakos v. United States,* 328 U.S. at 763–64, 66 S.Ct. at 1247; *see also United States v. Lane,* 474 U.S. at 464–65, 106 S.Ct. at 740 (Brennan, J., concurring in part and dissenting in part).

We have carefully examined the remaining assignments of error and have found therein no grounds for relief. The findings of guilty and the sentence, as approved on review below, are affirmed.

Judge REED and Judge MOLLISON concur.