USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

No. 96-1952

 UNITED STATES,

 Appellee,

 v.

 MARK BRUCK,

 Defendant, Appellant.

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MASSACHUSETTS

 [Hon. Frank H. Freedman, Senior U.S. District Judge]

 Before

 Torruella, Chief Judge,
 Selya and Stahl, Circuit Judges.
 
 

 Thomas G. Murray for appellant.
 Ariane D. Vuono, Assistant United States Attorney, with whom
Donald K. Stern, United States Attorney, was on brief for appellee.

September 1, 1998

 
 

 STAHL, Circuit Judge. Following an eight-day trial, a
jury convicted defendant-appellant Mark Bruck of conspiracy to
commit bank fraud, see 18 U.S.C. 371 (Count I); bank fraud, see18 U.S.C. 1344 (Count II); conspiracy to commit wire fraud, see18 U.S.C. 371 (Count III); wire fraud, see 18 U.S.C. 1343
(Counts IV and V); arson, see 18 U.S.C. 844(i) (Count VI); and
the use of fire to commit a felony, see 18 U.S.C. 844(h)(1)
(Count VII). Thereafter, the district court sentenced Bruck to
concurrent 78-month terms of incarceration on Counts I-VI, and a
consecutive 60-month term on Count VII. Bruck seeks a new trial,
arguing that the district court erred in (1) declining to sever
Counts I and II from the remaining charges in the indictment; (2)
declining to hold a hearing on his competence to stand trial and to
grant him an eve-of-trial continuance to gather evidence relating
to his allegedly impaired mental condition; and (3) permitting the
government's case agent to give certain opinion testimony. We
affirm.
 I.
 In disregard of Fed. R. App. P. 28(a)(4) and (e), Bruck's
brief contains neither a summary of the evidence presented at trial
nor pertinent record citations. We therefore largely adopt the
government's factual presentation, adding explanatory details
wherever we believe it helpful and deferring the details of the
procedural history relevant to the issues Bruck advances on appeal
to our discussions of those issues.
 Bruck was the President and principal stockholder of
Advance Resins, Inc. Advance Resins, which was in the business of
grinding, recycling, and coloring plastic, occupied three converted
airplane hangars in Chicopee, Massachusetts. The company used two
buildings it owned Buildings One and Two (we use the company's
denominations) for operations and office space, and a leased
building Building Three for storage. Advance Resins had once
been a promising business, but by 1990, it had fallen on hard
economic times.
 In January 1980, Advance Resins reached an agreement for
a revolving line of credit with Third National Bank. Throughout
the 1980s and into the 1990s, this agreement remained in effect
with Third National's two successor banks Bank of New England and
Fleet Bank. For the sake of simplicity, we refer to the three
banks collectively as "the Bank." According to the agreement,
Advance Resins had a borrowing capacity of up to $1.7 million,
depending upon the daily value of its inventory and accounts
receivable. Each morning, Advance Resins reported the value of its
accounts receivable to the Bank. By factoring in the value of the
company's inventory (which Advanced Resins reported monthly), the
Bank used this daily report to determine the amount of credit to
which the company would be entitled for the day.
 In the mid-1980s, Advance Resins began to experience cash
flow problems. This led Bruck to direct his employees to report
false inventory and sales figures to the Bank. By doing so,
Advance Resins fraudulently increased the amount of credit
available to it to meet the company's daily cash flow needs. In
late 1992, the Bank terminated the line of credit after discovering
Advance Resins' inaccurate reporting during a field examination of
the account. Thereafter, Advance Resins repaid in full all
outstanding loans from the Bank.
 Advance Resins' financial woes continued to mount. In
late February 1994, Bruck decided to expand the company's insurance
coverage (which had previously extended only to Buildings One and
Two) by purchasing from MassWest Insurance Company $1 million of
coverage for Building Three's physical plant and $900,000 of
coverage for its contents. Bruck explained to his insurance agent
that the company planned to purchase and improve Building Three in
order to make it suitable for operations. Immediately after
arranging for the additional insurance coverage, Bruck ordered his
employees to move equipment and highly flammable products into
Building Three.
 On Saturday, March 5, 1994, less than a week after
changing Advance Resins' insurance coverage, Bruck hired several
welders to do some minor work inside Building Three. Bruck met the
welders and stayed with them as they completed their work. The
welders left the building shortly after nightfall, but Bruck stayed
behind for a short time, ostensibly to lock up. Just before
midnight, a passerby reported to the Chicopee Fire Department that
Building Three was on fire. The fire destroyed the building and
its contents.
 The federal Bureau of Alcohol, Tobacco, and Firearms
("ATF") investigated the conflagration and determined, based upon
various fire investigation techniques, that the fire had numerous
points of origin in the warehouse area where Bruck had been alone
for some period after the welders departed the premises.
Significantly, there was no evidence that the fire had a point of
origin in the area of Building Three where the welders had been
working. The overall evidence led ATF to conclude that the fire
had been deliberately set.
 In interviews conducted shortly after the fire, Bruck
made a number of misleading statements to ATF agents. He indicated
that Advance Resins was immensely successful, falsely stating that
the company had recently gone to a 24-hour production schedule to
keep up with orders. He also claimed to be certain that the
welders had caused the fire, despite having noticed nothing unusual
while locking up after the welders had finished their work. 
Finally, he told the agents that the replacement cost of the
destroyed equipment and inventory was approximately $1.5 million. 
This proved to be a gross exaggeration.
 Investigators soon learned that, before the fire, Bruck
had ordered his bookkeeper and other employees to grossly inflate
the value of the inventory stored in Building Three. After the
fire, Bruck discovered that his employees had not finished
fabricating and recording the inflated figures. He then ordered
them to complete the task immediately so that he could present the
fictitious figures to the insurance adjuster. Eventually, Bruck
delivered to the adjuster false inventory figures indicating that
approximately $1.3 million in inventory had been lost in the fire. 
Not long thereafter, on February 7, 1995, a federal grand jury
returned a seven-count indictment charging Bruck with the crimes
for which he stands convicted. 
 II.
A. Misjoinder and Severance
 Prior to trial, Bruck filed a motion to sever the counts
pertaining to his bank fraud (Counts I and II) from the counts
pertaining to the insurance fraud and arson (Counts III-VII),
contending that these two groups of counts were not properly joined
under Fed. R. Crim. P. 8(a) ("Two or more offenses may be charged
in the same indictment . . . if the offenses charged . . . are of
the same or similar character or are based on the same act or
transaction or on two or more acts or transactions connected
together or constituting parts of a common scheme or plan."). 
Magistrate Judge Neiman agreed, holding that the bank fraud charges
and insurance fraud and arson-related charges were substantially
dissimilar and temporally distinct. He accordingly ordered that
Counts I and II be severed from the remaining counts and tried
separately. 
 The district court, however, summarily reversed the
magistrate judge's determination as contrary to law. See 28 U.S.C.
 636(b)(1)(A) (non-dispositive pretrial order of a magistrate
judge may be "reconsider[ed] . . . where it has been shown that the
. . . order is clearly erroneous or contrary to law"). The court
therefore ordered that all charges be tried together. Bruck claims
that the district court's ruling was prejudicial error.
 Insofar as Bruck claims error, his argument is not
without some force. Although the Tenth Circuit has taken the
position that three separate and apparently temporally distinct
bank and insurance fraud schemes were properly joined under Fed. R.
Crim. P. 8(a) because each involved an "alleged[] defraud[ing] of
the victim through the submission of falsified documents," United
States v. Hollis, 971 F.2d 1441, 1456 (10th Cir. 1992), we cannot
say that the factors we have cited repeatedly as most relevant to
whether two or more charges are properly joined strongly favored
joinder in this case. See United States v. Edgar, 82 F.3d 499, 503
(1st Cir.) (directing courts to look to "'whether the charges are
laid under the same statute, whether they involve similar victims,
locations, or modes of operation, and the time frame in which the
charged conduct occurred'") (quoting United States v. Taylor, 54
F.3d 967, 973 (1st Cir. 1995)), cert. denied, 117 S. Ct. 184 (1996). 
Furthermore, we note that arson, with the attendant physical
dangers it presents to, at the very least, the firefighters
summoned to extinguish the blaze, is an offense of dissimilar
character to bank fraud. Indeed, we note that the sentencing
guidelines set the base offense level for arson involving a
structure other than a dwelling, without any adjustments for
specific offense characteristics, at 20, see U.S.S.G. 
2K1.4(a)(2), but set the base offense level for bank fraud, sansspecific offense adjustments, at 6, see U.S.S.G. 2F1.1.
 We do, however, part company with Bruck insofar as he
views any misjoinder as prejudicial. See United States v. Lane,
474 U.S. 438, 449 (1986) ("[A]n error involving misjoinder affects
substantial rights and requires reversal only if the misjoinder
results in actual prejudice."); see also Fed. R. Crim. P. 52(a)
("Any error, defect, irregularity or variance which does not affect
substantial rights shall be disregarded."). We reach our
conclusion by assuming arguendo that a misjoinder exists but
answering in the negative the harmless-error inquiry appropriate
for non-constitutional error: was the putative error likely to
have "'had substantial and injurious effect or influence in
determining the jury's verdict?'" Lane, 474 U.S. at 449 (quoting
Kotteakos v. United States, 328 U.S. 750, 776 (1946)).
 Obviously, the rule against misjoinder primarily seeks to
serve the same interest advanced by the general rule set forth in
Fed. R. Evid. 404(b)("Evidence of other crimes, wrongs, or acts is
not admissible to prove the character of a person in order to show
action in conformity therewith."). That is, the rule against
misjoinder strives to ensure that the jury does not convict an
accused of a charged crime simply because the accused has been
charged with, or convicted of, a different, unrelated crime. Cf.United States v. Amato, 15 F.3d 230, 236-37 (2d Cir. 1994)
(recognizing that the joinder of dissimilar charges creates
excessive risk of prejudicial spillover). We therefore analyze
whether the insurance fraud and arson-related evidence was likely
to have caused the jury to convict on the bank fraud charges,
and/or whether the bank fraud evidence was likely to have caused
the jury to convict on the insurance fraud and arson-related
charges. On both issues, we think it unlikely that the jury was
led astray.
 With respect to the bank fraud charges, several factors
drive our conclusion. We believe it likely that, at a separate
bank fraud trial, much of the insurance fraud and arson-related
evidence would have been relevant to whether Bruck had the
requisite unlawful intent with respect to the bank fraud. See Fed.
R. Evid. 404(b) (evidence of similar other acts can be relevant to
issues pertaining to an accused's intent); cf. Lane, 474 U.S. at
450 (finding misjoinder harmless because evidence with respect to
the charge that should have been severed would likely have been
admissible at a separate trial). After all, Bruck's modus operandi inflating inventory and sales figures with the intent to secure
advantage from large financial institutions was nearly identical
in each episode. Moreover, Bruck's testimony tended to put in
question both whether he had the capacity to form the requisite
intent and whether Bruck was merely present where others were
committing the crime. See generally 2 Jack B. Weinstein & Margaret
A. Berger, Weinstein's Federal Evidence, 404.22[1][b] and
[c](Joseph M. Mclaughlin, ed., Matthew Bender 2d ed. 1998) (Fed. R.
Evid. 404(b) other act evidence tends to be relevant when
sufficiently similar to charged offense and when the defense puts
intent in question by challenging defendant's capacity and/or by
suggesting that defendant was merely present at a crime scene). 
The fact that the insurance fraud and arson came some time after
the bank fraud does not detract from the likely relevance of the
insurance fraud and arson-related evidence in this instance. Seeid. at 404.22[1][a] (noting that subsequent acts can be relevant
to prove intent).
 Of course, the trial court might have excluded this
evidence as cumulative because the evidence of Bruck's intent with
respect to the bank fraud, standing alone, was very strong. SeeFed. R. Evid. 403. Bruck's accountant and one of his sales agents
testified that Bruck had ordered them to falsify the books every
day for many years; their testimony was entirely consistent with
each other, with that of several Bank employees, and with reports
from customers; and the false accounting books were themselves
before the jury as evidence. Yet the overwhelming nature of this
evidence itself compels the conclusion that the insurance fraud and
arson-related evidence did not cause the jury to convict Bruck of
bank fraud. See Lane, 474 U.S. at 750 (overwhelming evidence of
guilt on a particular charge typically renders misjoinder of
another charge non-prejudicial).
 With respect to whether the bank fraud evidence likely
led the jury to convict Bruck on the insurance fraud and arson-
related charges, our analysis is similar. For the same reason that
much of the insurance fraud and arson-related evidence would likely
have been relevant at a bank fraud trial to show Bruck's intent
with respect to the bank fraud, much of the bank fraud evidence
would likely have been relevant at a trial on the insurance fraud
and arson-related charges to show Bruck's intent with respect to
those charges. Moreover, although the evidence against Bruck on
these charges was largely circumstantial, it was quite strong: the
fire came less than a week after Bruck changed the insurance to
cover a building Advance Resins did not yet own; Bruck moved
equipment and flammable material into Building Three immediately
before the fire; Bruck was the last person in the building before
the fire started; and Bruck sought to inflate the inventory figures
in Building Three before and after the fire. Finally, the bank
fraud evidence would only have tended to reinforce a theme that
already would have been before the jury on the basis of the
insurance fraud and arson-related evidence: that Bruck defrauded
large financial institutions in order to gain funds for Advance
Resins. Thus, although the bank fraud evidence also might have
been excludable as cumulative under Fed. R. Evid. 403, we are
confident that it was not the difference-maker that led the jury to
conclude that Bruck set the fire in Building Three and then sought
to defraud Advance Resins' insurer.
 For these reasons, we conclude that any misjoinder of the
bank fraud charges and the arson-related charges was not
prejudicial.
B. Competency and the Motion to Continue
 Bruck has a history of psychological illness, and as the
December 4, 1995 trial date approached (after several continuances
to accommodate defense counsel's schedule), Bruck began to behave
in a particularly erratic manner. Contrary to his lawyer's
specific instructions not to have contact with any witnesses, Bruck
wrote a letter to a government witness urging her to change her
anticipated testimony. Also, defense counsel reported that he was
experiencing ever-increasing difficulty in communicating with
Bruck, and that Bruck was showing signs of significant
disorientation and forgetfulness. Finally, counsel reported that
the Social Security Administration was sending Bruck's benefit
checks to Bruck's mother because it had concerns about Bruck's
competence to handle his own affairs. 
 On November 8, 1995, defense counsel brought these
matters to the district court's attention in a motion for a
competency hearing. In support of his motion, counsel argued that
Bruck was potentially incapable of understanding the proceedings
against him and/or assisting with his defense. See Dusky v. United
States, 362 U.S. 402, 402 (1960) (setting forth the test for
competence to stand trial). On November 13, 1995, the court
ordered that Bruck undergo an examination to determine his
competence to stand trial, but asked that the examination and
report be expedited to the extent practicable, given the proximity
of the trial date and the inconvenience yet another continuance
would cause a number of out-of-state government witnesses. Over
the next several days, Howard Lester, Ed.D., examined Bruck and
concluded that, while he would have liked to have conducted more
extensive testing and perused medical records he was unable to
obtain on the tight deadlines established by the court, Bruck was
competent to stand trial. Lester also concluded that Bruck
probably was fabricating or exaggerating many of his symptoms.
 On the basis of Lester's report (which was not filed
until December 1, 1995, but whose basic conclusions were reported
to the judge and counsel during the last week in November), the
court denied defense counsel's request for a full-blown evidentiary
hearing. So too did the court deny several motions by the defense
for a continuance filed between November 21, 1995 and December 4,
1995 to develop psychological evidence tending to establish that
Bruck was insane and/or lacked the mens rea to commit the crimes
with which he was charged. Bruck now claims that the district
court's failure to afford a competency hearing and/or to grant a
continuance was error. We do not agree.
 Because the conviction of a criminal defendant while he
is legally incompetent violates due process, see Pate v. Robinson,
383 U.S. 375, 378 (1965), a district court has a duty to order a
competency hearing if there is "reasonable cause" to doubt the
defendant's competence to stand trial, see 18 U.S.C. 4241. Yet
if a qualified mental health professional has determined that a
defendant is competent, "a court is not required to hold a further
evidentiary hearing absent extenuating circumstances." United
States v. Lebron, 76 F.3d 29, 32 (1st Cir.), cert. denied, 116 S.
Ct. 2537 (1996). We review a district court's decision not to hold
a full competency hearing only for abuse of discretion so long as
there was a sufficient evidentiary basis to ground the court's
competency determination. See id.
 We review the denial of a motion for a continuance to
develop or locate evidence pertinent to a defendant's psychological
condition under a similar paradigm. In conducting our review, we
consider (1) defendant's diligence in preparing his defense; (2)
the likely utility of the continuance if granted; (3) the
inconvenience to the court, witnesses, and the government; and (4)
the extent to which the defendant may have suffered prejudice from
the denial. See United States v. Soldevila-Lopez, 17 F.3d 480, 488
(1st Cir. 1994). Again here, we accord deference to the trial
court's decision to deny the motion. See id. at 487.
 In this instance, Bruck has provided us with no basis for
concluding that the lower court abused its discretion with respect
to its failure to hold a full-blown competency hearing. In his
brief, Bruck simply asserts, without elaboration, that "enough was
contained in counsel's motion and recitation to the Court, and
indeed in Dr. Lester's report which would warrant a conclusion"
that Bruck was incompetent. He also generally states that "[a]
reading of the Defendant's testimony during trial supports the
conclusion that the Defendant was not functioning within the realm
of competence," and points to the fact that the court had Bruck
taken into custody following the verdicts because it felt that
Bruck was a suicide risk. Such generalizations, unsupported by
efforts at applying specific record evidence to the relevant legal
standards, leaves us in the position of simply stating that, on our
review of the record, we discern no abuse of discretion in the
trial court's acceptance of Dr. Lester's conclusion that Bruck was
competent to stand trial without taking additional evidence.
 So too do we leave intact the court's decision not to
award Bruck an eve-of-trial continuance to develop further
psychological evidence. Bruck has made no effort to point us to
evidence suggesting that he had a diminished capacity to form
criminal intent and/or that he was legally insane at the time he
committed his crimes. All he has done is to emphasize that there
is evidence he never obtained e.g., whatever evidence led the
Social Security Administration to send Bruck's benefits checks to
Bruck's mother that might have assisted him in generating a last-
minute, mens rea-related defense. This argument is plainly
insufficient for us to find an abuse of discretion on this record,
especially given Bruck's failure to discuss the relevant insanity
and diminished capacity principles and to apply those principles to
the record of this case. In so ruling, we also note Bruck's
apparent lack of diligence in failing to secure the missing
evidence in the two and one-half years since his trial, despite the
fact that the extent to which the moving party may have been
prejudiced by the denial of a motion to continue is one of the
factors we look to in assessing whether the lower court acted
within its discretion. See Soldevila-Lopez, 17 F.3d at 488.
 For these reasons, we decline to revisit the question of
Bruck's competence and/or to order a new trial because the district
court denied Bruck's motions for a continuance.
C. Opinion Testimony
 In his brief, Bruck excerpts the following exchange
between the government's trial counsel and Special Agent Michael
Bouchard, who was the case agent and lead investigator in the
government's arson case against Bruck:
 Q. (By AUSA Kinder). Could you have
 a seat please[?] Based on the training and
 experience you have had in arson
 investigations, have you learned that there's
 certain indicators in an arson for profit
 scheme that you look for?

 MR. MURRAY [Defense counsel]: 
 Objection.

 THE COURT: He may testify.
 
 A. Yes.

 Q. Did you find any of those
 indicators for the investigation of the
 Advance Resins' fire?

 A. Yes, I did.

 Q. What were they?

 A. The fire was deliberately set in
 multiple locations. The fire was set for
 economic--

 MR. MURRAY: I object and move to
 strike. That is a conclusion left to the
 jury's determination, not this agent's.

 THE COURT: Well, he may give his
 opinion based on his experience, background
 and training, and on the number of fires he's
 investigated, teaching experience and so
 forth. Based on that, he may give his opinion
 as to whether or not it was a set fire and to
 show how he determined it.

Bruck then makes the following argument, which we reproduce
verbatim in its entirety:
 Allowing this testimony was clear
 error. In the first place defense counsel was
 totally surprised that an expert opinion had
 been sought from the agent, in that no notice
 was given under Rule 16(a)(1)E of the Federal
 Rules of Criminal Procedure. Additionally,
 the opinion is incompetent under Daubert v.
 Merrell Dow Pharmaceuticals, Inc., 509 U.S.
 579 (1993), and inadmissible under Rule 704(b)
 of the Federal Rules of Evidence as an opinion
 on the ultimate issue. The trial judge
 however was obdurate in allowing the testimony
 to remain. Given the disputed nature of the
 arson testimony, this error, standing alone,
 requires reversal.

At oral argument, counsel rested on his brief with respect to this
question.
 Counsel's approach to this issue has left us less than
fully certain as to exactly what testimony Bruck finds
objectionable. The government followed the lower court's lead and
assumed that the testimony being challenged was Agent Bouchard's
statement that "[t]he fire was deliberately set in multiple
locations." And indeed, in the "Overview" section of his brief,
Bruck states that he will be arguing that it was error to allow
Bouchard to opine that the fire was deliberately set. The timing
of counsel's objection, however, in combination with the non-
specific nature of the argument presented, leaves us wondering
whether the objected-to testimony was, in fact, Agent Bouchard's
opining that the fire was set for economic reasons. Given this
state of affairs, we regard the point as having been waived. SeeUnited States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990). But in
any event, in view of what we regard as strong evidence of guilt on
the insurance fraud and arson-related charges, we are confident
that any improperly-admitted opinion testimony was absolutely
harmless. See United States v. Newman, 49 F.3d 1, 7 (1st Cir. 1995)
(ruling that the erroneous admission of opinion as to the ultimate
issue of guilt or innocence was harmless).
 We therefore decline to disturb Bruck's convictions on
the basis of this colloquy.
 

 III.
 For the reasons stated, we affirm Bruck's convictions in
all respects.