Filed 12/4/14  P. v. Adams CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

|  |  |
|---|---|
| THE PEOPLE, | C071954 |
| Plaintiff and Respondent, | (Super. Ct. No. 11F01280) |
| v. | |
| TORREY LEVARR ADAMS, | |
| Defendant and Appellant. | |

A jury found defendant Torrey Levarr Adams not guilty of the first degree murder of Antonne Nelms, but guilty of the lesser included offense of second degree murder (Pen. Code, § 187, subd. (a)),[1] not guilty of the attempted murders of Eric Harris and Tushawn Cooks, and guilty of possession of cocaine for sale (Health & Saf. Code, § 11351) and possession of a firearm by a felon (former § 12021, subd. (a)(1)).  The jury also found true allegations that Nelm's killing was perpetrated by means of shooting a firearm from a motor vehicle with the intent to inflict great bodily injury (§ 190, subd. (d)), defendant was armed with a firearm (§ 12022, subd. (a)(1) ), defendant personally

---

[1] Further undesignated statutory references are to the Penal Code.

used a firearm (§ 12022.5, subd. (a), and defendant personally and intentionally discharged a firearm causing Nelm's death in the commission of Nelm's murder (§ 12022.53, subds. (c), (d)). The jury found not true an allegation that Nelm's murder was committed for the benefit of, at the direction of, or in association with, a criminal street gang, namely the Oak Park Bloods, with the specific intent to promote, further, and assist in criminal conduct by Oak Park Blood gang members (§ 186.22, subd. (b)(1)) and true an allegation that defendant was personally armed with a firearm during the commission of the drug offense (§12022, subd. (c)).

Sentenced to 45 years to life, plus 11 years in state prison, defendant appeals, contending the trial court abused its discretion in refusing to bifurcate the trial of the gang enhancement from the trial of the substantive offenses, and the admission of such evidence deprived him of his federal constitutional rights to due process and a fair trial. He also claims the trial court erred in denying his motion for a new trial based on newly discovered evidence.[2] Finding no error, we shall affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

On the afternoon of December 20, 2010, Nelms was shot and killed while walking down the street with friends Harris and Cooks. The bullet that killed him came from a car driven by defendant, and occupied by Darrell Miller and Tyrone Allen.

Allen testified for the prosecution at defendant and codefendant Miller's joint trial pursuant to an agreement that required him to, among other things "provide complete, truthful information and testimony" in exchange for a maximum sentence of 13 years in

---

[2] In his reply brief, defendant concedes that his challenge to the booking and classification fees is foreclosed by our Supreme Court's decision in *People v. McCullough* (2013) 56 Cal.4th 589. We accept the concession. (See *id.* at p. 597 [defendant who fails to challenge the sufficiency of the evidence when a booking fee is imposed cannot raise the challenge on appeal].)

state prison.[3]  The facts concerning defendant, Miller, and Allen's activities on the day of the shooting, December 20, 2010, are taken from Allen's testimony at trial.

Allen and Miller were approximately 20 years old at the time of the shooting. They had been friends since elementary school and were "like brothers."  Defendant was like a father to Miller.  Allen had known defendant as long as he had known Miller and considered Miller and defendant "family."  Allen denied any gang affiliation, but said that defendant is a Blood, explaining that defendant had told him he was a Blood.

On the day of the shooting, Allen and Miller planned to visit the grave site of their mutual friend Robert Haynes to commemorate Haynes's birthday (December 20th). Haynes, a member of the Oak Park, Fourth Avenue (FAB) street gang, had been murdered in 2008 by members of the Guttah Boyz street gang in what Allen described as a "gang-related" killing.

Sometime around 12:30 p.m. on the day of the shooting, Allen went to Miller's home.  Shortly thereafter, defendant showed up driving Miller's mother's car, and asked if they wanted to accompany him to SD Mart in South Sacramento to make a payment on a watch.  Allen and Miller agreed to go with defendant to SD Mart because they thought they would be able to stop by Haynes's grave site, which is in the same area.  Defendant drove, Miller sat in the front passenger seat, and Allen sat in the backseat behind Miller. Once they were inside the car, defendant pulled out a .38 caliber revolver and asked Miller to hold it.  Miller placed the gun inside a sling he was wearing on his arm.  Six days earlier, on December 14, 2010, Miller was shot in the arm during an altercation between members of the Oak Park Bloods and the G-Parkway Starz street gangs at Fly Cuts in South Sacramento.  Miller told Allen and a sheriff's detective that he was at the barbershop waiting to get a haircut at the time of the shooting.

---

[3]  Defendant and Darrell Miller were tried together with separate juries.

3

The trio drove to SD Mart off of Mack Road and remained there for about 20 minutes. When they returned to the car, Miller gave the gun back to defendant.

Defendant then drove to the Evergreen Shopping Center on Mack Road and Center Parkway. The shopping center is a well known hang out for Starz and G-Parkway gang members and is not an area Allen and Miller usually frequent because of "the whole situation over there." Allen recalled seeing Nelms, Harris, and Cooks in the parking lot, and a surveillance video showed defendant looking out into the parking lot in the direction Nelms, Harris, and Cooks were walking. According to Allen, "[T]here wasn't nothing said. We just got out of the car." Defendant and Miller went into Fashion Times where defendant purchased an orange and navy Houston Astros baseball hat, while Allen went to a liquor store to buy a Swisher and a drink. While Allen was line waiting to pay, he saw defendant and Miller motioning for him to "Come on, bro, come on, bro." Allen put his items back and left. The trio returned to the car and took their same seats-- defendant drove, Miller in the passenger seat, and Allen in the backseat behind Miller.

Defendant exited the parking lot, made a U-turn onto Center Parkway, toward Mack Road, and then made a right turn onto Mack Road, heading towards Nelms, Harris, and Cooks, who were "just walking down the street." Once they spotted the three men, Miller said, "That's the dude I got into a fight with – the dudes I got in a fight with in the Slopes." Approximately one year earlier, Miller told Allen he had gotten into a fight with some "dudes" at the Sunnyslope Apartments (the Slopes), and one of the men had kicked him in the face and knocked him out.

Defendant drove past the men and pulled into an apartment exit that was blocked by a gate. Defendant turned the car around so that it was backed up to the gate, aimed the gun at Nelms, Harris, and Cooks, and fired two or three shots. Allen insisted that no one threw up any gang signs or made any comments prior to the shooting and that nothing was said after the shooting. They just drove away like nothing had happened. Allen denied that the shooting was part of any plan and said they were just driving around. He

4

also denied possessing the gun at any point that day or telling detectives that he had the gun and defendant snatched it from him.

After the shooting, defendant drove to a friend's house in the Elder Creek area where he stayed, while Miller and Allen took the car the visit Haynes's grave site. Later that night, Miller sent Allen a text that read, "Keep that shit in the car, bro." Allen claimed not to have received the text. Sometime after the shooting, defendant told Allen that if he was contacted by police, "Just don't talk about it, don't say nothing about it." Defendant also offered to take responsibility for the shooting if necessary.

Miller's mother's car, a dark-purple four-door Honda Accord, which "clearly matched the vehicle that was . . . seen in the video on the day of the murder," was searched on December 27, 2010, seven days after the shooting. A black arm sling was found on the rear floorboard and gunshot residue was found on the headliner (the vehicle's internal roof).

Minutes before the shooting, Cooks saw a rusty, reddish colored four-door Honda pull in, back out a couple of seconds later, and then back into the side street. He saw three people in the car, one of whom was wearing a baseball hat with an orange brim. Cooks was walking next to Harris and talking to him when Nelms suddenly stopped and asked, "You see what they just did?" As soon as Cooks looked up, someone in the car began shooting. Cooks heard three or four shots. He did not see the gun but assumed the shots came from the backseat because the car was moving. Nelms, Harris, and Cooks took off running, but Nelms fell down and said, "I think I'm hit." Nelms died from a gunshot wound to his neck and chest.

Harris lived at the Slopes apartment complex in 2008 or 2009 and recalled seeing Miller there during that time. Harris acknowledged getting into fights at the Slopes but did not recall fighting Miller. Most of the fights Harris was in at the Slopes were gang related. Harris's cousin, a Crips gang member, sometimes provided "back . . . up" for Harris in those fights.

On February 17, 2011, defendant, Miller, and Allen were arrested and taken into custody. Allen was interviewed by police following his arrest. At first Allen was hesitant to identify the shooter, but after the detective insisted Miller was "giving up with all that's happened," Allen admitted being in the car at the time of the shooting and identified defendant as the shooter. He claimed not to know why the shooting occurred. Allen recalled, "[I]t wasn't even no conversation honestly, it was we pass em [*sic*] --," and "we backed in, and then psh [*sic*] -- and he just started shooting."

After being interviewed separately, defendant, Allen, and Miller were placed in an interview room together where their conversations were recorded. Among other things, defendant told Miller and Allen, "[T]his is looking bad because of the prior events that you was involved in. They want to damn near probably put it as a gang, something with some gangs which you know (unintelligible) telling them that, you know what I mean? With a gang." Miller responded, "It's not. It's not." Defendant continued, "Right, that can make a difference between a whole shit load of time."

At trial, Justin Saario, a detective in the Sacramento Police Department's gang unit, testified for the prosecution as an expert in African-American criminal street gangs. Saario explained that Starz and Guttah Boyz are subsets of the G-Mobb criminal street gang, and that G-Mobb is an acronym for G-Parkway. G-Mobb's main rival is the Oak Park Bloods and its subsets, the largest of which is FAB. Between 2008 and 2010, there were 26 shootings involving members of G-Mobb and the Oak Park Bloods. According to Saario, the Evergreen Shopping Center defendant drove to just prior to the shooting is a G-Mobb/Starz/Guttah Boyz stronghold.

The Oak Park Bloods have approximately 400 members, and its rivals are G-Mobb, its subsets, and the Crips, in general. They claim the color red, while the Crips claim the color blue. The Oak Park Bloods have several identifying hand signs, including making an "O" and a "P" with their fingers for Oak Park, making an "F, an "A," and a "B" with their finger for FAB, and making a "4" with their fingers for Fourth Avenue.

6

Their primary activities are robberies, weapons possession, assaults with deadly weapons, predominantly firearms, and to a lesser degree narcotics sales.

Saario described three predicate acts of the Oak Park Bloods for purposes of establishing the elements of the gang enhancement. In 2005 several Oak Park Bloods went looking for a Crip to murder in retaliation for the murder of a "Valley High Piru." Piru is another name for Blood. The group went to a known Crip hangout, and began shooting when a Crip exited a residence. During the altercation, an Oak Park Blood gang member accidentally shot and killed another Oak Park Blood gang member. The shooter was convicted of murder with a gang enhancement. In 2007 two Oak Park Bloods shot a woman who had complained about individuals selling drugs in front of her home. They pled to attempted murder with a gang enhancement. In 2008 an Oak Park Blood shot a man during an altercation between members of the Oak Park Bloods and a member of G-Mobb. The shooter was convicted of attempted murder with a gang enhancement.

Saario explained that respect in gang culture is different from "traditional respect" in that "it's a forced respect . . . . If --if you don't fear me, then you don't respect me. So, if you don't fear me, if you don't respect me, then I'm going to force you to respect me." Respect within the gang is earned by committing crimes. Disrespect must be met with consequences. Otherwise, one is viewed as weak.

Saario opined that Miller is an Oak Park Blood based on the totality of the circumstances, including his tattoos, conduct, and associations. Among other things, Saario relied on photographs of some of Miller's tattoos, various incidents in which Miller was involved, either directly or indirectly, in criminal activity with Bloods or Oak Park Bloods, and various photographs depicting Miller wearing red clothing, making various Blood and Oak Park Blood hand signs, and associating with known Blood and Oak Park Blood gang members.

Saario opined that Allen is an Oak Park Blood based on, among other things, Allen's admission that he is an Oak Park Blood, his ongoing association with Oak Park Bloods, and his involvement in gang related crimes.

Saario opined that defendant is a Blood gang member (as opposed to an Oak Park Blood) based on his tattoos, prior crimes, associations, and clothing. Defendant has tattoos of the phrase "West Koast" and the word "Kalifornia." Saario explained that Bloods commonly replace the letter "C" with the letter "K" to show disrespect for Crips. Defendant also has a tattoo of the Los Angeles Dodgers's symbol, "LA," in red, instead of Dodger blue. Saario also detailed nine incidents between 1998 and 2010 in which defendant was contacted by police in the company of Blood gang members and/or engaged in what Saario deemed "gang-related activities," including marijuana possession, narcotics sales, a home invasion robbery, an armed robbery, and firearms possession.

Saario opined that the victim Nelms was a Crip based on items found at the memorial constructed at the place he was shot. Saario also opined that Cooks and Harris were members of Crips gangs based on photographs he had seen and the clothing they were observed wearing.[4]

Based on a hypothetical using facts similar to those present here, Saario opined that the shooting of Nelms benefited the Oak Park Bloods because it enhanced their reputation. He explained, "[B]y those individuals pulling the firearm and shooting at and subsequently killing an individual who previously disrespected an Oak Park Blood gang member, that absolutely enhances the reputation of the gang . . . . [T]hose individuals, and Oak Park's, reputation is going to be enhanced because they are willing to commit that type of violence in . . . Starz territory against Starz or anybody possibly being Starz."

_____

[4] During cross-examination, Saario acknowledged that he had no information that Harris was a Crip or that Miller was an Oak Park Blood at the time of the fight in 2008.

Saario continued that the Oak Park Bloods reputation would be enhanced even if the individual who pulled the trigger is a Blood, not an Oak Park Blood, "because there is [*sic*] other Oak Park Blood gang members equally involved" in that they were with the shooter when the shooting occurred.

I

## The Trial Court Did Not Abuse Its Discretion in Denying Defendant's Motion to Bifurcate

Defendant contends that the trial court abused its discretion in refusing to bifurcate the trial of the gang enhancement from the substantive offenses, and that the admission of the gang evidence deprived him of his federal constitutional rights to due process and a fair trial. More particularly, he claims that "given the utter lack of evidence to supply a gang-related intent or motive for the instant shooting, it was an abuse of discretion to refuse to bifurcate the trial of said enhancement so that the admission of inflammatory gang evidence would not taint the trial of the main counts." We are not persuaded.

*A.    Background*

The prosecution sought to admit gang evidence to prove the gang enhancement allegations against defendant and Miller *and* establish a motive for the shooting, namely that it was in retaliation for the Guttah Boyz murder of Haynes and shooting of Miller. Defendant and Miller moved to bifurcate the trial of the gang enhancement from the substantive offenses, arguing gang evidence was irrelevant to the issue of motive because there was no evidence the shooting was gang-related. According to defendant and Miller, the only evidence was that the shooting was in retaliation for a fight between Miller and Harris a year earlier, which was not gang related. The prosecution opposed bifurcation, arguing that "to say that the only motive and the only contributing factor to this shooting was the fact that he saw a guy that he was in a fight with two years ago is . . . not correct." The prosecutor argued "there was a lot of other things going on that day . . . that contributed to that shooting besides just seeing Eric Harris, and every one of them

9

relates to gang involvement by Mr. Miller."  In particular, the prosecutor noted that Miller had been shot six days earlier in a shoot-out between members of G-Mobb and the Oak Park Bloods, Miller's close friend Robert Haynes had been shot by members of G-Mobb, and defendant and Miller were "at the Evergreen Shopping Center cruising around with a gun, which is essentially a G-Mobb . . . stronghold."  The prosecutor also asserted that even if the motive for the shooting was the fight, as urged by defendant and Miller, the gang expert would testify about gang mentality, the concept of disrespect, and how the disproportionate response to the fight was part of that mentality.  The trial court denied the motion to bifurcate, finding "the gang evidence is evidence with regard to potential motive and so therefore it is impossible to bifurcate it without actually providing the jury with a sterile case in somewhat of a vacuum."

B.      Law

"To establish this criminal street gang enhancement, the prosecution must prove some facts in addition to the elements of the underlying crime, for example, that the criminal street gang has engaged in a 'pattern of criminal gang activity.'  (§ 186.22, subds. (e) and (f).)[5]  Accordingly, when the prosecution charges the criminal street gang enhancement, it will often present evidence that would be inadmissible in a trial limited

---

[5]  To subject a defendant to the enhanced punishment for crimes related to a criminal street gang, " 'the prosecution must prove that the crime for which the defendant was convicted had been "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members."  (§ 186.22, subd. (b)(1) . . . .)  In addition, the prosecution must prove that the gang (1) is an ongoing association of three or more persons with a common name or common identifying sign or symbol; (2) has as one of its primary activities the commission of one or more of the criminal acts enumerated in the statute; and (3) includes members who either individually or collectively have engaged in a "pattern of criminal gang activity" by committing, attempting to commit, or soliciting two or more of the enumerated offenses (the so-called "predicate offenses") during the statutorily defined period.  (§ 186.22, subds. (e) and (f).)'  [Citation.]"  (*People v. Hernandez* (2004) 33 Cal. 4th 1040, 1047, fn. omitted.)

to the charged offense." (*People v. Hernandez, supra,* 33 Cal.4th at p. 1044.) To prove the gang enhancement, the prosecution may introduce expert testimony regarding street gangs. (*Id.* at pp. 1047–1048.)

"In cases *not* involving the gang enhancement, [our Supreme Court has] held that evidence of gang membership is potentially prejudicial and should not be admitted if its probative value is minimal. [Citation.] But evidence of gang membership is often relevant to, and admissible regarding, the charged offense. Evidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime. [Citations.] To the extent the evidence supporting the gang enhancement would be admissible at a trial of guilt, any inference of prejudice would be dispelled, and bifurcation would not be necessary." (*People v. Hernandez, supra*, 33 Cal.4th at pp. 1049-1050.)

Even if some of the gang evidence would have been inadmissible at a trial limited to guilt, bifurcation is not necessary unless such evidence is "so minimally probative on the charged offense[s], and so inflammatory in comparison, that it threaten[s] to sway the jury to convict regardless of defendants' actual guilt." (*People v. Hernandez, supra,* 33 Cal.4th at p. 1051.) Defendant bears the burden of clearly establishing a substantial danger of undue prejudice to him in conducting a unitary trial. (*Ibid*.)

Finally, even where the trial court's ruling on a motion to bifurcate was correct at the time it was made, the judgment must be reversed if the " ' "defendant shows that joinder actually resulted in 'gross unfairness' amounting to a denial of due process." [Citation.]' " (*People v. Grant* (2003) 113 Cal.App.4th 579, 587, quoting *People v. Mendoza* (2000) 24 Cal.4th 130, 162.) There can be no denial of due process unless there was actual prejudice, in that joinder " ' "had substantial and injurious effect or influence in determining the jury's verdict." ' " (*People v. Albarran* (2007) 149 Cal.App.4th 214,

231, fn. 17, quoting *United States v. Lane* (1986) 474 U.S. 438, 449 [88 L.Ed.2d 814, 826].)

*C.     Analysis*

We first consider whether the trial court's decision to deny bifurcation was correct when made (*People v. Mendoza* (2000) 24 Cal.4th 130, 160-161), and conclude that it was.

The prosecution claimed that Miller is a member of the Oak Park Bloods, and that defendant and Miller targeted Nelms, Harris, and Cooks because they believed Nelms, Harris, and Cooks were members of G-Mobb, the gang responsible for Haynes's murder and Miller's recent shooting. The prosecutor's offer of proof included the following: Miller is a member of the Oak Park Bloods; six days before Nelm's was shot and killed, Miller was shot in the arm during a shootout between members of the Oak Park Bloods and G-Mobb/Guttah Boyz; Haynes, a fellow Oak Park Blood and Miller's close friend, was killed by members of the Guttah Boyz; on the day of the shooting defendant, Miller, and Allen went to the Evergreen Shopping Center, a Guttah Boyz stronghold, where they spotted Nelms, Harris, and Cooks; defendant was armed with a .38-caliber revolver; defendant followed Nelms, Harris, and Cooks when they left the shopping center; three to five gun shots were fired in rapid succession from the car defendant was driving; and Miller and Allen admitted they were present in the car during the shooting and identified defendant as the shooter. One reasonable inference from the prosecution's proffer is that the motive of the shooting was retribution for Haynes's murder and Miller's shooting. While one also might reasonably conclude that the motive of the shooting was retribution for the prior fight between Miller and Harris, and that the fight was not gang-related, it does not follow that the trial court erred in denying bifurcation. As the trial court correctly observed, where the record supports two or more reasonable inferences, it is for the jury, not the court, to decide which inference to draw. Accordingly, defendant's

12

assertion that the trial could abused its discretion in refusing to bifurcate the trial of the gang enhancement from the substantive offenses fails.[6]

Defendant acknowledges that we review the trial court's discretion on the basis of the record as it was at the time of its ruling. (*People v. Mendoza*, *supra*, 24 Cal.4th at pp. 160-161.) However, he contends that the judgment must nevertheless be reversed, despite his failure to meet his burden in the trial court, because the introduction of the gang evidence resulted in gross unfairness amounting to a denial of due process. (*People v. Grant, supra,* 113 Cal.App.4th at p. 587.)

Defendant claims that "[e]vidence [he] was a gang member coupled with evidence of gang culture and customs suggested that he was disposed toward crime and was therefore guilty." As previously discussed, evidence defendant was a member of the Bloods, as well as evidence concerning the importance of respect in gang culture, and the consequences for displaying disrespect is relevant to motive, and thus is admissible in a trial limited to guilt. Accordingly, bifurcation, at least as to that evidence, was not necessary. (*People v. Hernandez, supra,* 33 Cal.4th at pp. 1049-1050.)

While some of the other gang evidence may not have been admitted at a trial limited to guilt, such evidence was not so minimally probative to the charged offenses and so inflammatory in comparison that it that it threatened to sway the jury to convict regardless of defendant's actual guilt. (See *People v. Hernandez, supra,* 33 Cal.4th at p. 1051.) Evidence that some Oak Park Blood members had been convicted of murder and

---

[6] While the prosecutor indicated that he intended to introduce additional evidence related to the gang enhancement at trial, including "predicate crimes" of the Oak Park Bloods, such evidence was not before the trial court at the time it denied the motion to bifurcate. Thus, the court was unable to balance any potential prejudice such evidence may have presented in making its ruling. In any event, the sole basis for the motion to bifurcate was the purported lack of evidence to support a finding the shooting was gang related. As detailed above, the prosecution's proffer presented a sufficient basis for inferring the shooting was gang motivated.

13

attempted murder with gang enhancements was "offered to prove the charged gang enhancement, so no problem of confusion with collateral matters would arise, and they were not evidence of offenses for which . . . defendant might have escaped punishment." (*Ibid.*)

Defendant complains that "the jury was treated to an expose of [his] specific criminal history as the result of the failure to bifurcate the gang enhancement." We assume defendant is referring to evidence of defendant's prior contacts with law enforcement. Such evidence was offered to prove defendant's membership in the Bloods, which is relevant to defendant's motive, and thus, admissible in a trial limited to guilt. Accordingly, bifurcation was not necessary. (See *People v. Hernandez, supra,* 33 Cal.4th at pp. 1049-1050.) In any event, evidence defendant was involved in drug sales, firearms possession, or robbery is not particularly inflammatory when compared to a drive-by shooting committed on a public street in broad daylight.

Moreover, any danger that the jury would rely upon the gang evidence for an improper purpose was minimized by the court's limiting instruction. (See *People v. Foster* (2010) 50 Cal.4th 1301, 1332.) The court instructed the jury in the language of CALCRIM No. 1403 as follows: "You may consider evidence of gang activity only for the limited purpose of deciding whether: [¶] The defendant acted with the intent, purpose, and knowledge that are required to prove the gang-related enhancement charged. [¶] You may also consider this evidence when you evaluate the credibility or believability of a witness and when you consider the facts and information relied on by an expert witness in reaching his or her opinion. [¶] You may not consider this evidence for any other purpose. You may not conclude from this evidence that the defendant is a person of bad character or that he has a disposition to commit crime."

The jury's verdict strongly suggests that it was not swayed by the gang evidence to convict regardless of defendant's guilt. Significantly, the jury found defendant *not* guilty of the first degree murder of Nelms, but guilty of the lesser included offense of second

degree murder, and *not* guilty of the attempted murders of Harris and Cooks. It also found the gang enhancement allegation *not* true.

Finally, in *People v. Grant*, cited by defendant, the court ruled that joinder violated a defendant's right to due process because (1) the evidence in support of the charged offenses would not have been cross-admissible in separate trials, (2) the prosecution improperly urged the jury to consider evidence relating to any of the charged offenses when determining the defendant's guilt on a particular charge, (3) the court did not instruct the jury it could not consider evidence related to other charged offenses when determining the defendant's guilt on a particular charged offense, and (4) the case for one of the charged offenses was substantially stronger than the case for the others. (*People v. Grant, supra,* 113 Cal.App.4th at p. 588.) None of these factors is present here. As previously discussed, some of the gang evidence would have been cross-admissible in separate trials; the prosecution did not urge the jury to consider gang evidence unrelated to motive or intent when determining defendant's guilt on the substantive offenses; the trial court gave a limiting instruction concerning the gang evidence; and the evidence supporting the substantive offenses was not substantially stronger than the evidence supporting the gang enhancement notwithstanding the jury's not true finding.

Defendant's reliance on *People v. Albarran* (2007) 149 Cal.App.4th 214, likewise, is misplaced. There, the court found the admission of gang evidence inflammatory and prejudicial where the trial court had dismissed the gang allegations following a new trial motion and the prosecution failed to present evidence the underlying crimes were gang-motivated, circumstances not present here. (*Id.* at pp. 227-228.) As detailed above, the prosecution in this case presented evidence of gang motive. Bifurcation would have denied the prosecution the ability to present evidence of motive for the charged offenses.

For all the foregoing reasons, the trial court did not abuse its discretion in refusing to bifurcate the gang enhancement, and the admission of such evidence did result in gross unfairness amounting to a denial of due process.

15

## II

### The Trial Court Did Not Err in Denying Defendant's Motion for a New Trial

Defendant next contends the trial court erred in denying his motion for new trial based on newly discovered evidence. We are not persuaded.

*A.     Background*

Following the trial, the prosecution moved to nullify Allen's plea agreement on the ground he "perjured himself at trial." The prosecutor argued Allen was untruthful in his testimony that (1) there were no conversations in the car prior to the murder of Nelms other than Miller's isolated statement regarding a prior fight, (2) neither Allen nor Miller did anything to encourage or aid in the shooting, and (3) it was a complete surprise to Allen and Miller when defendant started shooting. According to the prosecutor, "[t]his issue was central to the case against *Darrell Miller.*" (Italics added.) The prosecutor further asserted, "The jury found, contrary to Mr. Allen's testimony, that Mr. Miller did in fact aid and abet the murder of Nelms. The jury verdict is a strong statement that Mr. Allen was untruthful in this regard." The trial court agreed and nullified the agreement, finding that Allen failed to testify truthfully regarding what happened in the minutes preceding the shooting and regarding his handling of the gun.

Thereafter, defendant moved for a new trial based on newly discovered evidence, namely "the judicial decree that Mr. Allen has violated his immunity agreement." The trial court denied the motion, noting that its findings with regard to Allen's testimony "were discrete as to two particular aspects of his testimony," and the prosecutor "did argue to the jury that, in fact, Mr. Allen was not completely truthful. So the jury did have the ability to weigh and to consider the testimony of Mr. Allen."

*B.     Law*

A trial court may, upon a defendant's application, grant a new trial when "new evidence is discovered material to the defendant, and which he could not, with reasonable diligence, have discovered and produced at the trial." (§ 1181, subd. 8.) To justify a new

16

trial the " 'newly discovered evidence . . . must make a different result probable on retrial.' " (*People v. Verdugo* (2010) 50 Cal.4th 263, 308.) We review the trial court's ruling denying the motion for a new trial under the deferential abuse of discretion standard. (*People v. Davis* (1995) 10 Cal.4th 463, 523-524.)

C.    *Analysis*

Evidence Allen was untruthful in his testimony at trial is not new. During closing argument, the prosecutor acknowledged Allen lied. Indeed, defendant's trial counsel seized on the prosecutor's concession during his closing argument, asserting that the prosecutor was attempting to have it both ways by urging the jury to find Allen truthful in some parts of his testimony and untruthful in others, and urging the jury to find Allen untruthful in all parts of his testimony, "except maybe his name." Moreover, as the prosecutor noted in his motion to nullify the agreement, the jury necessarily rejected Allen's testimony concerning the lack of any discussion preceding the shooting and his and Miller's ignorance about what was about to happen in finding Miller aided and abetted in Nelm's murder.

Even if Allen's untruthfulness was "newly discovered" such evidence would not assist defendant on retrial because the testimony the court determined was untruthful benefited defendant. Allen's testimony that nothing was said prior to the shooting other than Miller's comment, "That's the dude I got into a fight with – the dudes I got in a fight with in the Slopes," benefited defendant in that it undermined the prosecution's assertion that the shooting was premeditated and done in retaliation for Miller's shooting and Haynes's murder as well as its assertion that the shooting was gang-related.

Finally, to the extent defendant contends the trial court's finding that Allen was untruthful is relevant to Allen's credibility generally, such evidence is cumulative. At trial, Allen repeatedly admitted lying to detectives about the events in question following his arrest, the prosecution acknowledged Allen was untruthful in some of his testimony, and defendant's trial court urged the jury to reject Allen's testimony in its entirety given

17

the prosecution's acknowledgement and Allen's desire to save himself by testifying against defendant and Miller.

The trial court did not abuse its discretion in denying defendant's motion for a new trial based on newly discovered evidence.

DISPOSITION

The judgment is affirmed.


     BLEASE     , Acting P. J.


We concur:


   HULL    , J.


   MURRAY   , J.